(83 South. 491)

No. 23530.

SAVINGS & HOMESTEAD ASS'N v. FRANK et al.

In re NATIONAL SURETY CO.

(Nov. 3, 1919.   Rehearing Denied Dec. 1, 1919.)

*(Syllabus by the Court.)*

1. MECHANICS' LIENS ☞227 — MECHANIC'S PRIVILEGES; FAILURE TO RECORD BUILDING CONTRACT TO MAKE PROPERTY LIABLE TO LIEN FOR MATERIALMEN AND TO RELEASE SURETY AS TO HIM.

Act No. 221 of 1914, § 1, provides that a building contract involving over $500 shall be reduced to writing and recorded, and, as thus recorded, shall create a lien and privilege on the building and the ground upon which it is erect-

ed in favor of the undertaker, contractor, master mechanic, engineer, mechanic, or furnisher of material, as their interest may occur; makes it the duty of the owner to require a bond, with good and solvent surety, for the faithful execution of the contract, and the payment, by such undertaker, contractor, etc., of all subcontractors, workmen, laborers, mechanics, and furnishers of material, and to have such bond recorded, with the contract; provides the conditions upon which the liens, so created, may be enforced by the holders, or canceled by the owner; declares that, in the event the owner has a claim, in concursus with the other claimants who have liens and privileges, they shall be paid in preference to the owner; and further declares that, if the owner fails to exact or to cause the bond to be recorded, he shall be in default and shall be liable to the same extent as the surety would have been, and that all subcontractors, workmen, laborers, mechanics, and furnishers of material shall have a first privilege on the building, or improvement, to secure the amounts due them, when their claims are recorded as provided in the act. The act further declares that its purpose is to require owners to secure bonds, with solvent and sufficient sureties, of the undertaker, contractor, etc., for the protection of all parties interested in the contract, as their interest may occur, and that the surety, and in default of the surety, the owner, is to stand in the place of a defaulting undertaker, contractor, etc.

*Held,* That the further purpose of the statute, and the intended effect of a compliance with the requirement that the contract and bond shall be recorded, are that those who are, or who may become, interested therein, may not only be fully advised of the character of the contract, but may have written and recorded assurance that it will be executed in accordance with its terms, by the owner as well as the contractor; that, apart from the particular provisions of the statute in question, good faith and fair dealing demand that it should be so executed; and that, where such execution is prevented by the action and inaction of the owner, he and the property may, under some circumstances, be held directly liable to the unpaid furnishers of material, and as to him and the property the surety on the bond discharged, and the question of the liability of the surety to such furnishers reserved.

2. CONTRACTS ⟨⇒⟩313(2) — APPLICATION OF STATUTE GIVING RIGHT TO OWNER TO CANCEL BUILDING CONTRACT AT PLEASURE.

Article 2765 of the Civil Code, which declares that the owner may cancel a building contract "at pleasure," but that in such case he must pay the undertaker for the work done and expense incurred, and such damages as the case may require, has no application, where one contract has been superseded by another, with the consent of both parties, and the same undertaker appears in both contracts.

*(Additional Syllabus by Editorial Staff.)*

3. PRINCIPAL AND SURETY ⟨⇒⟩100(1)—MAKING NEW CONTRACT AS RELEASING SURETY.

Under Act No. 221 of 1914, §.1, requiring certain building contracts to be reduced to writing and recorded, and the owner to require a bond for its faithful execution, and to have it recorded, a new unrecorded contract and prosecution thereunder of work called for by a former recorded contract upon terms materially differing therefrom releases surety on owner's bond from its obligation as to recorded contract so far as immediate parties thereto, including the contractor and the one appearing as owner, are concerned, as a surety's contract cannot be changed without its consent.

Concursus proceedings by the Savings & Homestead Association against August Frank, the National Surety Company, Dr. C. N. Gibbons, and others, persons and firms asserting claims for labor and material, and for judgment distributing a fund deposited by plaintiff, discharging it with its costs and ordering cancellation of liens recorded against the building. From a judgment in the district court the Surety Company appealed to the Supreme Court, and another of the parties appealed to the Court of Appeal, after which the appeals to the Supreme Court and to the Court of Appeal were consolidated with the appeal pending in Court of Appeal, and from its judgment the Supreme Court granted the National Surety Company a writ of certiorari. Judgment of Court of Appeal and judgment of district court thereby reviewed, so far as condemning the National Surety Company or making an award of money in its favor, except for costs, annulled, and that company dismissed from this proceeding with costs, etc., with reservation of rights of materialmen, etc., and other parts of the judgment amended, and part of

judgment discharging plaintiff recast and plaintiff to have judgment against Dr. Charles N. Gibbons and August Frank, in solido, and in other respects not disturbed.

See, also, 144 La. 35, 80 South. 190.

Grant & Grant, of New Orleans, for petitioner National Surety Co.

Henry G. McCall, of New Orleans, for plaintiff Savings & Homestead Ass'n.

Sol. Weiss, of New Orleans, for defendant Gibbons.

MONROE, C. J. Plaintiff (hereinafter called Homestead) deposited $940 in the civil district court, alleging that to be the balance due by it to the defendant August Frank on a certain building contract; praying that Frank, the National Surety Company (hereafter called Surety Company), Dr. C. N. Gibbons, and a number of persons and firms, asserting claims for labor and material, be cited to appear and litigate their rights, and after due proceedings that there be judgment distributing the fund so deposited, discharging the petitioner, with its costs, including attorney's fees, and ordering the cancellation of the liens recorded against the building erected under the contract and the lot upon which it was erected; and there was a judgment in the district court, from which the Surety Company appealed to this court, and another of the parties appealed to the Court of Appeal, after which the appeal to this court was transferred to the Court of Appeal and consolidated with the appeal there pending, and a judgment rendered by that court has now been brought here for review, upon the application of the Surety Company, which application, with the record sent up by the Court of Appeal, discloses the following case for our consideration, to wit:

Dr. Charles N. Gibbons owned lots A, B, C, in the square bounded by Dublin, Apricot, Dante, and Belfast streets, measuring each 30 feet front on Dublin street by 120 feet in depth, lot A having a side line on Apricot street. He also owned lot D, lying adjacent to lot C, with the same frontage and depth, and he owned, in indivision with John T. Gibbons, lot E, fronting on Apricot street and having a side line adjacent to the rear ends of lots A, B, C, and D. In 1912 he contracted with plaintiff for the building of a residence on lots A, B, and C, at a cost of $6,400, and, as usual in such cases, transferred the title to the lots to plaintiff and was granted a loan, the proceeds of which were to be, and were, expended by plaintiff in the erection of the residence, which was made to front on Apricot, instead of Dublin, street, as originally intended. Thereafter several years passed, and, no payment having been made in reduction of the principal of the debt thus created, the lots were not reconveyed to Gibbons, and in 1915 appeared on the public records as the property of the plaintiff. In that situation, in August, 1915, Gibbons entered into negotiations with E. P. Braud, which resulted in an agreement to the effect that Braud should buy from him, for $1,600, a lot, to be taken from the rear (or Dante street) ends of lots A, B, C, and D, measuring, say, 48 feet front on Apricot street by a depth of 120 feet, upon which Gibbons assumed the obligation of having a residence erected for Braud, according to a certain plan and specifications, by A. B. Mason, architect, and at a cost to Braud of $4,700. The exact terms of the agreement are not made clear, but it appears that it was within the contemplation of the parties that the work should be started by the defendant Frank (contractor and builder), under a contract with Gibbons, and that Braud should at the same time make an application to the plaintiff (Homestead Association) for a loan of $4,700, which, when granted and accepted, should be applied under a contract with the Homestead to its further pros-

ecution and completion. At all events, the action taken was as follows: On September 2, 1915, Gibbons entered into a contract with the defendant Frank, whereby Frank agreed to erect the residence for $3,020, according to plan and specifications, prepared by Mason, architect, the contractor to furnish all labor and material, with the "Exceptions: The owner to furnish all the lumber, oak floors and mill-work;" the building to be completed by December 1, 1915; and no part of the price to be paid until its completion and the production of a certificate showing no liens. The Surety Company (relator herein) signed the contractor's bond for $1,600, and the contract and bond were duly recorded. Gibbons also (probably before entering into that contract, or about that time) obtained a proposal from Frank to erect the building, according to the same plan and specifications, for $4,700. He introduced Braud to the plaintiff, to whom (or which) Braud applied for a loan of $4,700, to be used by plaintiff in the erection, according to the same plan and specifications, of the building covered by the contract above mentioned; and on September 16th Braud received from plaintiff a communication reading in part:

"We beg to advise you that we will make you a loan of $4,700.00, on lot measuring 48 feet front on Apricot street, by 120 feet deep; * * * ground to be transferred to us, and we to enter into a building contract for erection of dwelling to cost $4,700.00, as per plans already furnished," etc. (meaning the plan by Mason, to which we have referred).

In the meanwhile Frank had been actively engaged in the execution of his contract with Gibbons, and Braud had paid Gibbons some cash and had delivered to Frank, to be used (for Gibbons' account) in the building, lumber to the value of $665 (as estimated by Gibbons and himself), both cash and lumber to be credited against the $1,600 that Braud had agreed to pay for the lot;

and the loan offered by plaintiff was not then accepted, but was held in abeyance, and Frank continued the work of erecting the building under his contract with Gibbons until November 5th, by which time, as we infer, his money and credit were exhausted; and, the building being about one half completed, and the loan tendered by plaintiff to Braud having by that time apparently been accepted, on behalf of Mrs. Braud, he (Frank) upon that day entered into a contract with plaintiff whereby, without alluding to the contract under which he was working, he agreed to erect for $4,700 the identical building, according to the same plan and specifications, that he was then engaged in erecting for Gibbons, agreeing to furnish all labor and material, and the price to be paid in five installments of $940 each as the work progressed, but no time being fixed for its completion, and the contract differing in some other respects from the contract with Gibbons. The lot upon which the building was being erected had never been accurately described, and in the new contract it was described only as "on Apricot street, between Dublin and Dante streets, in square bounded by Belfast," but there is an admission in the record to the effect that it is correctly described as follows:

"Begins at a distance of 77 feet 4 inches from the corner of Apricot and Dublin streets and measures 50 feet front on Apricot street by a depth of 120 feet between equal and parallel lines."

Of the area thus described, 42.8 feet front on Apricot street by a depth of 90 feet, forming part of lots A, B, C, already stood in the name of plaintiff, subject to the right of Gibbons to require a reconveyance to him on his paying the debt of $6,400 which he owed plaintiff; a strip having a front of 17.4 feet on Apricot street by 120 feet in depth belonged to C. N. and J. T. Gibbons, and a piece of land constituting the rear end of lot

D, measuring 50x30 feet, belonged to C. N. Gibbons, or to him and J. T. Gibbons; and, according to the admission above mentioned, those parcels were conveyed to plaintiff on November 10th, upon which day Gibbons, with the assent of the relator herein, as surety for the execution of the contract of September 2d, made an assignment to plaintiff of all his right and interest in that contract. In order, however, to enable Gibbons to comply with his obligation to Braud, it was considered necessary that he should disincumber that portion of the lot in question which was to be taken from the lots A, B, and C, the title which he had conveyed to plaintiff to secure his debt of $6,400, and plaintiff was unwilling to release the same until Gibbons should have arranged to make a proportionate reduction in that debt. On November 11th, therefore, Gibbons and Frank executed a private writing, whereby Frank agreed that:

"All payments made to me [him] by the Savings & Homestead Association [under the contract of November 5th, though referred to as the contract "this day executed"], over and above the sum of $3,020.00, shall be paid to Dr. Charles N. Gibbons, to reimburse him for the material and labor which he has obligated himself to furnish in the construction of said improvements, over and above the sum of $3,020.00, which said payments are to be made by me each time that I receive installments from the Savings & Homestead Association for account of the contract that I have this day executed with it."

And Gibbons executed a private writing (produced by the plaintiff and probably executed contemporaneously with the others, though it bears no date) in which, after reciting the fact and purport of the contract of November 5th, and the further fact that "the contractor has requested two payments of $940 each on account of said building contract," he declares as follows:

"Now, I, Charles N. Gibbons * * * obligate myself, in solido with the said * * *

Frank, contractor, for the payment of all material and labor already used and to be hereafter used in said improvements, until the completion and acceptance thereof, * * * and to pay all costs and charges, including fee, or fees, for the attorney who may be employed by the association for resisting demands, defending suits, or causing the cancellation of any such inscriptions arising or growing out of the contract which the * * * association has made with the said August Frank. * * *"

Neither the contract, the assignment, nor the above-quoted writings have ever been recorded, and as between Frank and Gibbons it seems to have been understood that Frank was to go on with the work as agreed in the contract of September 2d. The "payments over and above the sum of $3,020, including the deposit in court, represented in the aggregate the difference between the amount called for by the old and new contracts, respectively, which was $1,680; and, as that amount was to be paid to Gibbons, as the installments under the new contract were paid to Frank, it follows that from each payment of $940 to Frank $336 were to be deducted as though paid to Gibbons, but in order to meet the demand of the plaintiff that he reduce his debt to it, Gibbons had agreed that, as the installments of $336 were credited to him, they should be retained by plaintiff and credited in reduction of that debt. When, therefore (on November 11th also), plaintiff issued its check for $1,880 to the order of Frank, as in payment of the two first installments of an amount called for by its contract with Frank, the parties in interest all assembled at the office of M. H. Manion, plaintiff's attorney and notary, Frank being accompanied by Mr. Stehle, plaintiff's secretary, who probably bore the check, which was then indorsed by Frank, delivered to Manion, and deposited by him to the credit of his own account. He then in the presence of Stehle and the others gave Frank his own check for $908 as Frank's

proportion of the proceeds of the check for $1,880, gave Gibbons a check for $300, in reimbursement of that amount which Gibbons asserted had been loaned by him to Frank to aid him in carrying on the contract of September 2d, and disposed of the balance, together with the proceeds of two checks thereafter issued as in payment of the third and fourth installments called for by the contract, and similarly handled as follows, to wit: On November 23, 1915, and January 12, 1916, respectively, plaintiff issued its two checks, each for $940, and, they being indorsed by Frank, and delivered to and deposited by Manion, he (by error, as to $640) turned over the entire proceeds of the check of November 23, 1915, to plaintiff, and from the check of January 12, 1916, he paid Frank $604, the total amount paid to Frank from the three checks having been $1,512, and the total amount returned to plaintiff, $1,749, leaving a balance of proceeds in Manion's hands, according to his account, of $198.54, which he applied to the payment of certain taxes or expenses, so that the account stands as follows:

```
Total checks received (1880+940+940=)......$3,760 00
Paid to Frank.......................$1,512 00
Paid to Gibbons.....................  300 00
Paid to Plaintiff................... 1,749 77
Paid in taxes, etc..................  198 54   $3,760 31
```

(The item $198.54 should read $198.23, which explains the error of 31 cents, since, deducting $604 as an overpayment to plaintiff on the third installment from the $1,749.77 actually paid should leave $1,145.77, which falls short by $198.23 of the exact balance required in order to account for the $760 received by the accountant.)

Mr. Braud eventually found the affair in which he had become involved "an awful mix-up," and after the completion of the house sold his interest to W. E. Taylor, who has gone into possession, but is still waiting for a clear title.

Mr. Stehle, plaintiff's secretary, testified at great length, in an effort to make it clear that plaintiff entered into the contract of November 5th in utter ignorance of that of September 2d, and yet he admits that he knew that payments would fall due within a few days after the later contract was entered into "because the house had been partly constructed." He says that he did not know that it was being constructed on lots to which plaintiff had title, though he admits that that information was developed when Mrs. Braud applied for the loan, and that the application was put in early in September, which was about the time that the work on the building was begun. His mental attitude may be inferred from the following excerpts from his testimony, to wit:

"Q. You stated that the Homestead had no knowledge of Dr. Gibbons' building on this property? A. I know, in a general way, that Dr. Gibbons was building up on Apricot street, but not on this ground. Q. Why did the Homestead contract with Mrs. Braud to build that residence for $4,700? A. We had an application from Mrs. Braud—we presumably were building the house for Mrs. Braud. She came in the regular course of business, and made an application for a loan, and it developed, then, that it was on Dr. Gibbons' property—the property we had for account of Dr. Gibbons—and it was necessary to buy more ground. He sold us additional ground, and, as it were, we put the ground in a pot and divided it, and that is the way the building contract was made with Mrs. Braud. * * * Q. Did Mrs. Braud agree to take over the residence that you had contracted to build, for $4,700? A. Yes, sir. Q. And you didn't know that work had begun on the residence? A. I didn't know that it was on our ground. Q. You knew it on that date? A. I knew that it was between the time we signed the contract and the application was made before us, probably four weeks. Q. Is it not a fact that you discussed it with Mr. Frank? A. Yes, sir; probably three weeks before, or a month before. * * * Q. The first check was for $1,880. Frank indorsed that over to Mr. Manion? A. I see from the indorsement that he did, but I don't know anything about it. Q. Do you know whether Mr. Manion gave a check to Mr. Frank for his [word omitted]? A. No, sir; I don't know

anything about it—what it was. I don't know anything about any arrangement they had amongst themselves. Q. Were you present when any checks were given by Mr. Manion to Mr. Frank? A. I might have been, but I don't know anything about it; I wasn't interested in it at all, if it was given. Q. Did Mr. Manion give the Homestead Company any of his checks? A. We were getting checks from Mr. Manion all the time. Q. On this transaction did the Homestead receive any checks from Mr. Manion? A. I can better answer that question in this way: I felt that there were some arrangements between the contractor and Dr. Gibbons and Mr. Manion, but what they were I don't know, but I think, after the settlements were made with Mr. Frank, I got some checks from Mr. Manion. * * * Well, I can say this, whatever checks we got from Mr. Manion in this transaction had no connection with this loan; whatever checks we got from Mr. Manion in this transaction wouldn't have gone on the account of Dr. Gibbons. Q. At this time, did Dr. Gibbons owe the Homestead anything? A. Yes, sir. * * * Q. Did he make any payments in this loan about this time? A. Yes, sir; payments were made on Dr. Gibbons' loan. Q. Who gave you those payments? A. I believe Mr. Manion. * * * Q. On November 10th [should be November 5th] you increased the amount of your contract? A. No, sir; we had nothing to do with the first contract. Q. The first contract was for $3,020? A. No, sir; I don't know anything about that. Q. Why did you make the payments on November 11th of $1,880? A. Because we entered into a contract to build a house for Mrs. Braud. We knew the house was in course of construction, and we knew we would have to make a payment on it in a few days. We would be ready for the payment in a few days, because a certain amount of the work had been completed. I knew that. * * * Q. Weren't the same plans and specifications submitted on the first contract used in erecting the building under the second contract? A. I presume so; they were identically the same."

He had previously testified as follows:

"Q. How did your company happen to take over the contract of September 2d from Dr. Gibbons? A. We took it over under our regular form of application, and I knew then the building was under construction, and we estimated it by that—what the ground was worth and what the building was worth, and that is how we came to make the loan."

Having been recalled, the witness corrected the testimony thus given as follows:

"When I was here before, I said I thought that the first knowledge I had of any loan was about 30 days before November, the signing of the second contract. But I have since found that about the first part of September we had an application from Mr. Braud for a loan of $4,700 for a dwelling to be erected on Apricot street, on this property here."

Mr. Manion gives the following testimony concerning his relation to the retention from the price called for by the building contract of the money that he returned to plaintiff, to wit:

"Q. Mr. Manion, you were official notary— A. For the Homestead; yes, sir. Q. You are a member of the board of directors, and were a member at that time? A. Yes, sir. Q. Were you attorney for them also? A. No, sir; I never was. * * * Q. How did you come to protect the Homestead, if you were not acting for them? A. I was certainly acting for the Homestead in getting $1,600. Certainly I was acting for the Homestead in getting that $1,600. Q. I thought you denied it? A. Oh, no."

And Mr. Stehle testifies that the Homestead looked to Mr. Manion to get the $1,600.

As indicating how little the checks issued by plaintiff to the order of Frank were under Frank's control, we make the following excerpt from Frank's testimony, to wit:

"Those checks were brought to Mr. Manion's office by the secretary of the Homestead, Mr. Stehle. The first two payments were brought by Mr. Stehle in the presence of Mr. Gibbons—the check for the first two payments. The check for the third payment was sent to Mr. Manion's office, and was left there, and he in turn phoned me to come over and indorse it; and the check for the fourth payment, I went to the homestead office to get it from Mr. Stehle, and he brought me over to Dr. Gibbons' office, and from there we went to Mr. Manion's office, and Mr. Manion wasn't in, and he walked me back and forwards from about 2 until half past 5. At last we seen Mr. Manion in his office, and Mr. Stehle gave the check to Mr. Manion and Mr. Manion had me to indorse it over to him, and he gave me his check in return for $604. All these checks were left at Mr. Manion's office."

Frank, it seems, on the occasion thus described was in rather desperate need of money, and in the light of his testimony the attempt of plaintiff's witnesses to make it appear that the checks called for by the contract of November 5th were delivered to him as a free agent borders upon the absurd, the facts being that they were not delivered to him at all, but that they were drawn to his order, and he was called on to indorse them, in order that it might be made to appear that money, which he never touched and was given no opportunity to touch, and which never left the possession of plaintiff's agent, passed into his hands and was paid out by him to Gibbons.

The questions, of the assignment to plaintiff of Gibbons' interest in the old contract, and of the entering by plaintiff into the new contract, were being considered at the same time, though not by the same parties, and, there having been a delay in the matter of the assignment, by reason of the fact that the representative of the Surety Company found it necessary to consult his principal in another city, the new contract (to which the Surety Company was not to become a party) was signed on November 5th without his knowledge or consent, whereas the signatures to the assignments were not affixed until November 10th. It is said that the agent had been informed, prior to the assignment, that a contract had been entered into; but, even though that were the case (and we do not consider it proved), it is not shown that he was advised as to the scope or terms of the new contract, or that he was placed in a position to form, or was under any obligation to form, and still less to express, any opinion about it, and particularly as the information, such as it was, is admitted to have been given to him at the very time that he was engaged in the business of giving the assent of his principal to the assignment by Gibbons of his rights in the old contract to plaintiff;

the whole apparent purpose and effect of that assignment having been to substitute plaintiff for Gibbons without otherwise changing the contract, but thereby to insure its further execution in accordance with its terms.

The judgment of the district court condemns the contractor, the Surety Company, and Gibbons in solido to pay the claims of 20 furnishers of material, with interest from various dates and costs, the aggregate in principal amounting to over $2,800, but limits the liability of Frank and Gibbons to the amounts of the bond signed by them, respectively ($1,600 and $2,350), and is in their favor and against the contractor for whatever amounts they may be required to pay; the $940 on deposit to be first applied to the payment of the costs and the balance to be distributed pro rata among the materialmen. It then discharges the plaintiff from further liability under its contract with Frank, and directs that the inscriptions of the building contract and attested accounts be canceled. It further condemns the Surety Company and Gibbons in solido to pay plaintiff $50 as attorney's fees and $100 as the fee of the special commissioner; and, finally, it allows the respective claimants, whose claims are recognized and who are not otherwise specially mentioned in that respect, $150 each for costs expended in recording their liens. The judgment of the Court of Appeal affirms that judgment with respects to the claims of all the furnishers of material, except W. W. Carré Company, Limited, for $515, and George W. Prechter for $83.60, with the condition that, if execution be issued thereon, or upon any of the said claims, against Gibbons, he shall thereupon be subrogated to the rights of the claimants against the Surety Company.

It reverses that judgment in so far as it condemns the Surety Company to pay the two excepted claims above mentioned and the fee of plaintiff's attorneys, and orders that it

stand as a judgment against Frank and Gibbons alone.

It orders that upon paying the amounts for which it is condemned the Surety Company be allowed to withdraw the deposit of $940, and that it thereupon have judgment against Gibbons in the sum of $200, with interest, and for one-half of all the costs paid by it, except those of the appeal.

It further orders that, in determining the limit of the liability of the Surety Company, the costs of this proceeding shall not be included, and that such limit shall be taken to mean $1,600 over and above the $940 which the company is authorized to withdraw and the $200 for which it gets judgment against Gibbons.

In other respects the judgment appealed from is affirmed, and each appellant is condemned to bear the costs of his (or its) own appeal.

## Opinion.

Plaintiff's secretary insists upon it that all payments made by him were made under the contract of November 5th (hereafter called the new contract), and that none were made under the contract of September 2d (hereafter called the recorded contract), but he admits that the check for $1,880, issued on November 11th, though issued in compliance with the call of the new contract, for two installments of the price, was required for work done under the recorded contract (and it could not have been otherwise, since no other work had been done), and it is not denied that plaintiff was substituted for Gibbons as the owner in the new contract. But whatever be the view of the secretary, it may be regarded as quite certain that in the payment of the four installments called for by the new contract both the plaintiff and the contractor considered that the work done under both contracts was being paid for under both, and that no other payment, save such as may result from the judgment to be herein rendered, is contemplated. It is also quite certain that of the total of $3,766, for which plaintiff has issued its checks, the contractor has received but $1,512; that $300 was paid by plaintiff's agent, with the acquiescence of the contractor, to C. N. Gibbons, in reimbursement of an alleged loan, and that the balance of $1,948, by virtue of private and unrecorded agreements between the contractor and Gibbons and Gibbons and plaintiff (or by error to which its attention was called), was retained by plaintiff and credited upon a debt due to it by Gibbons, or devoted to other purpose entirely irrelevant to the building contract; that in the meanwhile, and up to the present time, none, or next to none, of the material used in the construction of the building in question has been paid for; that the unpaid claims · on that account, which are here asserted, amount to more than $2,800; and that, save by the deposit in court of the $940, representing the last installment called for by the new contract, no provision has been made for their payment.

It further appears that the title to the main lot, upon which the building actually stands, has from the beginning of the transaction here involved, been vested in plaintiff; that the small parcels, measuring, respectively, 17.4 feet on Apricot street and 50x30 feet in the rear, were added to the main lot to round out its dimensions to 50x120 feet; that plaintiff knew from the beginning that Gibbons, appearing as owner, was having the building erected upon land the title to which was registered in its name; and that it was agreed between them that he should pay $1,600 (or $1,680) for its release.

Dr. Gibbons' testimony to that effect is direct and specific, as follows:

"By Mr. Manion: Dr. Gibbons, immediately upon this transaction being consummated [referring to what took place, on November 11th, upon the receipt by Manion of plaintiff's check to Frank for $1,880] is it not a fact that I asked you to pay the $1,600 which you had

agreed to pay the Homestead; that you agreed to pay the Homestead to release that property upon which you had built your home? A. Mr. Manion, the only way that I can answer that is by saying that the $1,680 was to be taken out of Mr. Frank's payments, and you knew just exactly what it was; you made the figures; you knew it was to come out of the $4,700; and you were going to pay it to the Homestead. Now I don't know whether you paid it to the Homestead in one check or three checks or five checks. Q. Is it not a fact that it was only after you stated that you could not pay the Homestead $1,600; it was only then that the arrangement was made to take these $1,600 out of these five payments? A. I say again, the $1,680 was known to come out of this $4,700 at the beginning."

At another time, having been recalled after all other testimony was in, he was asked whether, under the recorded contract, the price was to be paid in installments or at the completion of the building, and he answered:

"It was to have been paid after the completion of the structure, and the $3,020 was to have been paid all at one time. Q. From what source? A. From the Savings & Homestead Association. Q. On the loan to be applied for in the name of Mrs. Braud? A. Yes, sir. Q. And that is why Frank wasn't receiving any payments on the contract except the advances you made him? A. That is the only reason; he couldn't go any further; he had no more money, so I agreed to allow the Homestead proposition to go through—all through— so he could get the money, payments he was not justly entitled to at that time."

The statement that according to the recorded contract Frank was to be paid on the completion of the building "all at one time," and that the payment was to come from the Homestead, "on the loan to be applied for in the name of Mrs. Braud," clearly related back to the date of the recorded contract, and, considered in connection with the unusual (not to say, unheard of) agreement thereby witnessed, that Frank was to be paid nothing until the building should have been completed and accepted, and various other circumstances, as clearly shows that it was

understood that the contract between Frank and Gibbons was to be followed by one between Frank and plaintiff, and that the difference of $1,680 between the amount called for by the one and that called for by the other was to be regarded as a profit inuring to Gibbons, which, with the consent of Frank, was to be retained by plaintiff and credited in reduction of Gibbons' debt to it of $6,400.

Stehle, plaintiff's secretary, makes the statement that he did not see how the $1,680 (or $1,600) could come out of the building contract, and Gibbons says that he did not see where else it was to come from. The fact remains that, to the knowledge of both of them, acquired before the event, that amount was retained by Manion, acting for both Gibbons and the plaintiff, and was remitted to plaintiff, and it makes no difference for the purposes of this case whether that knowledge was acquired immediately before, or two months before, it was so retained and remitted.

As to the testimony concerning relator's knowledge of the new contract, though the utmost that could be claimed for it be conceded, it establishes no basis from which it can reasonably be argued that relator ever became a party or a privy to that contract, or ever waived any of its rights as surety for the execution of the recorded contract. Quite to the contrary, it shows beyond question that the new contract was entered into on November 5th, without previous notice to relator, and fails to show that even subsequently it was advised as to its term and conditions, and that the assignment (to which it consented) to plaintiff of Gibbons' rights in the recorded contract was made 5 days later and contains no allusion to the new contract, but authorizes the assumption that it (the recorded contract) was to be executed in accordance with its terms. Thus the assignment and consent, quoting all that is here pertinent, read:

"For value received, I hereby assign * * * to the * * * association all of my right * * * and interest in and to * * * contract entered into by me with August Frank on September 2, 1915, * * * including any interest or right which I have in the bond, * * * wherein the National Surety Company is guarantor in the sum of $1,600. * * * The said contract covering the construction, by the said August Frank, of a certain bungalow residence on Apricot street; * * * the intent and purpose of this transfer and assignment is to put the * * * association in the same position as respects the conditions and obligations of the contract which the same August Frank made with me and of the conditions of the bond attached thereto, to the same effect as though each and every stipulation was particularly written herein to carry into effect said objects.

"Witness my signature at the city of New Orleans this 10th day of November, 1915.

"[Signed] Chas. N. Gibbons.

   *    *    *    *    *    *    *

"We have taken cognizance of the above assignment and transfer, * * * and consent thereto, and agree that all the rights and remedies given to Dr. Gibbons or to the furnishers of labor and material used in the construction of the improvements contemplated in the said contract shall be the property of, and belong to, the * * * association, to the same effect for all purposes as though the said contract was originally executed by * * * Frank with the * * * association and our bond was made in conformity therewith. * * *

"National Surety Company,

"[Signed] By S. Royden Fanning,

          "Res. Pres. Vice President.

"Louis Coiron,

          "Res. Asst. Secretary."

[1-3] The effect of the new contract and of the prosecution of the work, called for by both contracts, upon terms and conditions differing materially from those agreed on in the recorded contract, was therefore to release relator from the obligation which it had assumed with respect to the recorded contract, at least in so far as the immediate parties thereto (meaning the contractor and Gibbons, appearing as owner) were concerned. As has been said by this court:

"It is common learning that the contract cannot be changed without the consent of the surety." Orleans & J. R. Co. v. International Const. Co., 113 La. 413, 37 South. 11

—citing many authorities, including McGuire v. Wooldridge, 6 Rob. 50, and Ins. Co. v. Randall, 42 La. Ann. 260–265, 7 South. 679, and quoting from the case first mentioned as follows:

"It is a well-settled rule that the surety has a right to stand upon the very terms of his contract, even if he should be benefited by the change, and the creditor has no right to make any such change."

See, also, Penn. v. Collins, 5 Rob. 213, and C. C. art. 3039, which latter declares that:

"Suretyship cannot be presumed; it ought to be expressed, and is to be restrained within the limits intended by the contract."

It is said that the case falls within the meaning of C. C. art. 2765 which declares that the owner may cancel a building contract "at pleasure," but that in such case he must pay the "undertaker" for the work done and expenses incurred, and such damages as the case may require. But that article has no application to a case such as this, where one contract has been superseded by another, with the consent of both owner and undertaker, and the same undertaker appears in both contracts.

The most serious questions here presented are those which concern the relations toward each other of the Surety Company, the Homestead, and the furnishers of material. It will be remembered that the contract of September 2, 1915, and the bond upon which relator appears as surety therefor alone were recorded, and that their registry has remained uncanceled up to the present time; and, so far as we are informed, the furnishers of material had no knowledge of any other contract or bond until they were called into this concursus. It does not appear that they were even informed, prior to that time, of the assignment to plaintiff, and its assumption of Gibbons' rights in the recorded

contract, and they may be presumed to have furnished their material upon the faith of the record, which disclosed only that contract and the bond securing its execution. Inasmuch, however, as the action and inaction of the plaintiff, co-operating with Gibbons and the contractor, prevented the execution of the recorded contract, we are of opinion that plaintiff and its property should be held to stand between the claims of the materialmen and the surety on that bond, and that, without expressing any opinion upon the question of the liability vel non of the surety for such claims, it will sufficiently subserve the ends of justice to reserve to the claimants such rights as they may have against the surety, to be asserted in the event that their claims are not otherwise satisfied.

Our further reasons for the conclusions thus stated are as follows: Act No. 221 of 1914, p. 418, in accordance with which the bond signed by relator was given, provides that contracts such as those under consideration shall be reduced to writing and recorded, and that:

"Such recordation shall create a lien and privilege on the building and grounds or other work * * * in favor of the said undertaker, contractor, master mechanic, * * * or furnisher of materials as their interest may occur. The owner of such work shall require of said * * * contractor * * * a bond, * * * which bond shall be attached to and recorded with the contract, * * * and the conditions of the bond shall be the true and faithful performance of the contract and the payment of all * * * furnishers of materials * * * jointly as their interest may occur."

It further provides that every person having a claim against the undertaker, contractor, etc., shall, after the completion of the work, or default of the contractor, etc., file a sworn statement of the same with the owner and record same in mortgage office, within 30 days after registry in that office of notice by the owner of the acceptance of the work; that if no such claims are recorded, as thus required, the recorder may, upon written demand, erase the inscription of the contract, or bond; that if at the expiration of 30 days there are such claims recorded, the owner shall file a petition in court, citing the claimants and others to appear and litigate in concursus; and further that:

"*In the event that the owner has a claim in concursus with the other claimants who have a lien and privilege under the provisions of this act, they shall be paid in preference to the owner.* * * * If objections are made to the sufficiency or solvency of the surety, they shall be tried summarily and if the surety is found to be not solvent or insufficient to cover the full amount for which he is bound, *or if the owner fails to exact bond, or if he fails to cause same to be recorded in the office of the recorder of mortgages in the manner or in the time herein above provided the owner shall be in default and shall be liable to the same extent as the surety would have been, and all subcontractors * * * and furnishers of materials shall have a first privilege on said building or improvement to secure the amount due them when their claims are recorded as herein provided. The surety herein shall be limited to such defenses * * * as the principal on the bond can make. The purpose of this act is to require owners to secure bonds with solvent and sufficient security of the undertaker, contractor, * * * for the protection of all parties interested in the contract, and as their interest may occur, and said surety, and, in default of surety the owner is to stand in the place of a defaulting undertaker, contractor, master mechanic or engineer.*" (Italics by the court.)

It will be observed that the statute begins with the declaration that the reduction of the contract to writing, and its recordation, create a lien upon the building and grounds, in favor of the contractor, the laborers and the materialmen, and that it proceeds to provide a method whereby the owner, upon whom as such the burden of the lien is thus imposed, may protect himself against its enforcement by taking the prescribed action, to wit, requiring a bond, with good surety, and having the bond recorded. It is clear, therefore, that unless he takes that action, the lien created by the inscription of the

contract stands, and continues to be enforceable, and equally clear, as we think, that if, after having caused the bond to be recorded, he releases the surety, or by his act brings about a situation in which it would be unconscionable to hold the surety whether to the obligation incurred to him or to the other obligees of the bond, the same result must follow as though he had required no bond, to wit, he becomes liable, as the surety would have been, and the liens created by the recording of the written contract stand and may be enforced. The obligation of the surety that he guarantees to the owner the faithful execution by the contractor of the contract, and to the laborers and materialmen the payment of the amounts that may become due them, is predicated upon the obligation of the owner to execute his part of the contract, by placing at the disposition of the contractor the price of the building, upon which the contractor must rely to pay those amounts, in accordance with the terms of the contract; that is to say, either in a lump sum, on the completion and acceptance of the work (as provided in the contract for which relator became surety), or otherwise, as the contract may require. It may be said that, according to the statute and as a fact, the surety now before the court bound' itself for the payment by the contractor of the claims of the laborers and materialmen without regard to any question as to the payment of the contract price by the owner to the contractor; but we think that the statute and the bond for which it provides should be construed together, and that the provision of the statute which reads:

"In the event that the owner has a claim in concursus with the other claimants who have a lien and privilege under the provisions of this act, they shall be paid in preference to the owner"

—runs directly in favor of the "other claimants" thus mentioned, as also does the obligation of the recorded contract to the effect that the payment of the price shall be made in a lump sum, upon the completion and acceptance of the work, and not before then, and especially is that true when considered with reference to the eighth paragraph of article 2772 of the Civil Code, which reads:

"If, by collusion or otherwise, the owner of any building erected by contract as aforesaid, shall pay to his contractor any money in advance of the sum due on the contract, and if the amount still due the contractor after such payment has been made, shall be insufficient to satisfy the demand made for work and labor done and performed, or materials furnished, the owner shall be liable to the amount that would have been due at the time of his receiving the account of such work, in the same manner as if no payment had been made."

It is true that the act of 1914 repeals all laws, or parts of laws, in conflict with its provisions, and that parts of the article thus quoted are thereby and therefore repealed. The paragraph quoted is, however, not in conflict with the act of 1914, but is in perfect harmony with it and even though it should be thought to be confined in its application to the particular contract provided for in the preceding paragraphs of the article, good faith and fair dealing and a correct interpretation of the act of 1914 demand that the rule thus prescribed should be applied to contracts entered into, and bonds given, under that statute, one of the manifest purposes of which, in requiring the owner to have his building contract recorded, is that, being thus opened to public inspection, it may inform all those who may become interested, by furnishing labor and material, of the manner in which it is to be executed, and enable them to protect themselves accordingly. If, however, in violation of the terms of the recorded contract, the owner can, with impunity, pay the price when the work is half done, instead of when completed, or if by virtue of some unrecorded contract or agreement, whether with the contractor and a third person or with either,

he can withhold the price, in whole or in part, and attribute the amount withheld to the payment of a debt due to himself, whether by the contractor or a third person, he repudiates the assurance contained in the recorded contract that the price will be paid to the contractor, to be used by him as a free agent in paying for the labor and material required in the construction of the building; and the recording of the contract as provided by the statute means merely the setting of a trap whereby the furnishers of material and the surety on the contractor's bond are alike ensnared, and the owner has his house built at their expense, or at the expense of the surety. In the instant case, the surety on the bond, given for the execution of the recorded contract, was relying, and had a right to rely, upon the assurance therein contained that, upon the completion and acceptance of the work, and not before then, the sum of $3,020 would be paid to the contractor, for the erection of a frame building in accordance with a specified plan, the owner to furnish a specified portion of the required material, and it was for it (the character of the building, the obligation of the contractor, and the price considered) to determine whether it would guarantee the execution of the contract. According to the new contract, the price (increased to $4,700) was to be paid in installments, as the work progressed, and the contractor was to furnish all the material; but by a collateral, secret, and unrecorded instrument Gibbons, who appeared as owner in the recorded contract and as surety on the bond given by the contractor for the execution of the new contract, bound himself in solido with the contractor "for the payment of all material and labor, already used and to be hereafter used on said improvements, until the completion and acceptance thereof," and the contractor, in consideration of that obligation, agreed that $1,680 of the price called for by the new contract should be deducted therefrom for account of Gibbons, who at the same time agreed that it should be retained by plaintiff, in reduction of a debt due by him in another matter. On November 11th, therefore, 6 days after the signing of the new contract, plaintiff issued its check for $1,880, as for two installments said to be due thereunder to the contractor, though, as we infer, but little work, if any, had been done since the contract was signed, but it withheld $672, as a payment to it by Gibbons, and through its agent paid $300 to Gibbons from the proceeds of the check, in reimbursement of an alleged loan to the contractor, all without notice to the surety on the bond given for the execution of the recorded contract, and notwithstanding that no part of the $2,800, or more, here claimed by the furnishers of material, had been paid by Gibbons, and notwithstanding that according to the law Gibbons' claim for the $300, alleged to have been loaned to the contractor, should have been subordinated to, and not thus given precedence over, those of the furnishers of material. The proceeds of the third and fourth installments, according to the new contract, as we have stated, were distributed as follows: $1,276 returned to plaintiff (of which, as testified by its agent, $604 was returned through error, and $672 under its agreement with the contractor and Gibbons), and the balance of $604 was paid to the contractor, making the total so paid $1,512, as heretofore stated.

The action and inaction of the plaintiff, to which we have referred as rendering it directly liable, under the law above quoted, and otherwise, to the furnishers of material, may then be summarized as follows, to wit:

Although the registered owner of the lot on which the building here in question has been erected, plaintiff acquiesced in the appearance of Gibbons in the recorded contract as the owner. It, then, with the concurrence

of Gibbons and the contractor, but in disregard of the rights of the surety on the contractor's bond, assumed to ignore, or abrogate, that contract, while appropriating the work which had been done thereunder by entering into a new contract for the same work, with the same contractor, but differing from the recorded contract in the matters of the price, the terms of payment, and the time allowed for its execution; by making payments in accordance with the provisions of the new contract, but in violation of those of the recorded contract, being in anticipation of the payment thereby contemplated; by deducting from the payments as made the sum of $300, said to be due by the contractor to C. N. Gibbons in reimbursement of a loan, and paying the same to Gibbons, to the prejudice of the claims of the furnishers of material, which were entitled to the preference; by retaining from the price the sum of $1,749.-77, and to the prejudice of the rights of the furnishers of material and of relator as surety applying the same (as having been assigned by the contractor to Gibbons and by Gibbons to it) in reduction of a debt due to it by Gibbons; by retaining $198.23, for some other purposes irrelevant to the building contract; and by failing to record the new contract, or the bond given to secure its execution.

Our conclusions are: That plaintiff and the property here involved are liable to the furnishers of material, whose claims have herein been adjudicated favorably to the claimants (with the exception of W. W. Carre Company, Limited, and George W. Prechter), to the amount of $2,248, or so much thereof as, added to the $940 deposited in court, may be required to satisfy their demands; that plaintiff and its property should stand between the said claimants and any liability on the part of the relator herein, as surety, and that the question of the liability vel non of relator need not be determined, but may

be reserved; that plaintiff should have judgment against C. N. Gibbons and August Frank in solido for whatever amount it may be compelled to pay under this judgment; that the National Surety Company should be dismissed with its costs, but reserving to the several furnishers of material whatever rights they may have against that company, to be asserted in the event their claims or any of them are not otherwise satisfied under the judgment to be rendered herein.

For the reasons thus assigned, it is ordered and decreed that, in so far as the judgment of the Court of Appeal, here made the subject of review, and the judgment of the district court, thereby reviewed, or either of them, condemn the National Surety Company or make an award of money in its favor, save for costs, said judgments be annulled; and it is now ordered that the National Surety Company be dismissed from this proceeding, and that it recover all costs expended or incurred by it, including the cost of this application, reserving, however, to all furnishers of material who have obtained judgments herein whatever rights they may have against said company, to be asserted as such furnishers may elect, in the event of their inability to obtain payment of their claims, under this judgment.

It is further ordered that, in so far as by the judgment of the Court of Appeal the National Surety Company is condemned, in solido with August Frank and Charles N. Gibbons, to pay the claims of furnishers of material, and is authorized upon making such payment, and paying the costs of these proceedings, to withdraw from the registry of the court the $940 there deposited, said judgment be amended by the substitution therein of the name of the Savings & Homestead Association in the place of that of the National Surety Company.

It is further ordered that, in so far as by the decree of the Court of Appeal the Savings

& Homestead Association is ordered discharged from further liability under the building contracts here made the subject of litigation, and the inscriptions thereof and of the attested accounts of furnishers of material are ordered to be canceled, said decree be recast so as to read:

"It is further ordered and decreed that the Savings & Homestead Association be not discharged from liability herein, and that the liens, in favor of the furnishers of material, resulting from the inscriptions of the building contract of September 2, 1915, and of the attested accounts for material furnished during the execution of that contract and of the contract of November 5, 1915, be not canceled, until the judgment in favor of such furnishers shall have been paid and the docket satisfied."

It is further ordered that, to the extent that it is hereby condemned to pay the claims of the furnishers of material the Savings & Homestead Association have judgment against Charles N. Gibbons, with leave to proceed herein by rule for the execution of the same, and that in other respects said judgment of the Court of Appeal remain undisturbed.