*C. G. De Armas*, for the plaintiff. *L. Janin*, for the appellants.

# THE NEW ORLEANS CANAL AND BANKING COMPANY *v.* HAGAN.

The insertion in a mortgage executed to secure a debt due by a third person, of a clause by which the mortgagor "confesses judgment for the amount of the debt, and agrees, in case of its non-payment as provided by the act, that the law, in such cases made and provided, may be strictly enforced and summarily put in execution," is not evidence that the mortgagor intended to bind himself personally for the payment of the debt. The clause was intended merely to give the remedy by executory process against the hypothecated property. It does not authorize the taking out of a *fi. fa.* against other property of the mortgagor, nor the registry of the act so as to operate as a judicial mortgage. C. C. 3263.

The execution of a mortgage to secure the fulfilment of an obligation of a third person, gives no right of action against the mortgagor personally. C. C. 3264. Whether the mortgagor intended to bind himself personally, is a question of intention, to be determined by a just and reasonable construction of the whole instrument.

Contracts of suretyship must be construed strictly. The law favors the surety.

Suretyship cannot be presumed. C. C. 3008. Nor does it imply a mortgage on the property of the surety. No mortgage exists unless expressly stipulated. C. C. 3010.

Defendant obtained a loan from a bank prohibited by its charter from taking more than a certain rate of interest on any of its loans, on the condition of his executing a mortgage on certain property to secure its repayment, with the highest rate of interest which the charter of the bank allowed, and of his granting a second mortgage, on the same property, to secure a debt due to the bank by a third person. In an action to enforce the mortgage executed to secure the debt due by such third person: *Held*, that by requiring the second mortgage, the bank

stipulated for something more than the payment of the highest rate of interest allowed by its charter, that the stipulation was usurious and illegal, and that the mortgage to secure the debt due by such third person cannot be enforced.

NEW ORLEANS
CANAL AND
BANKING COM-
PANY.
*v.*
HAGAN.

APPEAL from the Commercial Court of New Orleans, *Watts*, J. *F. B Conrad*, for the plaintiffs. *L. Janin*, *Benjamin* and *Micou*, for the defendant. *Preston*, appellant, *pro se*.

The judgment of the court was pronounced by

SLIDELL, J.   It is unnecessary to recite the peculiar circumstances under which the numerous and conflicting interests presented by this record, have become the subject of discussion in one suit.   It will suffice to state what the parties ask at our hands.   The Canal Bank, having obtained an order of seizure and sale upon a mortgage note for $12,000, *Preston* and *Adams* claimed an interest in the proceeds of sale, as mortgage creditors to the amount of $68,000, and interest, not disputing, however, the validity of the mortgage in favor of the bank.   They, also, claimed a judgment against *John Hagan*, personally, for $67,510, with large arrearages of interest.   Other relief, as to the mode of selling the property, &c., was asked by *Adams* and *Preston*, which it is unnecessary to detail.   *Hagan* resisted the claims of *Adams* and *Preston* upon three grounds principally, to wit : that they were not the owners of the alleged mortgage claim ; that if they were, he had never incurred any personal liability, and was a mere mortgagor ; and lastly, by a plea filed during the progress of the trial, that the contract of which *Preston* and *Adams* professed to be the assignees, was void for usury.

The material facts of this case are as follows : On the 22d May, 1839, *John Hagan* executed a notarial act of mortgage in favor of the Canal Bank and the Exchange Bank, for loans made to him by these corporations respectively, being $20,000 by the Exchange Bank, and $12,000 by the Canal Bank.   Two notes were given by *Hagan* for these amounts, each payable at one year from the date of the act ; the one of $20,000, to the order of the Exchange Bank, bearing seven per cent per annum interest, from date till final payment, and the one of $12,000, to the order of the Canal Bank, bearing interest at eight per cent per annum, from date until final payment.   *Hagan* acknowledges the receipt of the full amount of the respective loans in cash, on the day on which the act and notes were executed.

On the 25th May, 1839, being three days subsequent to the giving of the mortgage, and the receipt of the above loans, *Hagan* executes another act of mortgage, before the same notary, in favor of the same banks, upon the same real estate.   The debts to be secured, and the circumstances under which the mortgage was agreed to be given, as well as the extent of *Hagan's* contract, will be best exhibited by citing the language of the act :   " Personally came and appeared *John Hagan*, of this city, who declared that Messrs. *Hagan, Niven & Co.*, *Buchanan, Hagan & Co.*, and *Thomas Barrett & Co.*, of this city, merchants, are justly and truly indebted unto the Exchange and Banking Company of New Orleans, as follows, to wit : the said firms of *Hagan, Niven & Co.*, and *Buchanan, Hagan & Co.*, jointly, in the full sum of $21,000, and the said firm of *Thomas Barrett & Co.*, in the full sum of $60,000, to secure the payment of which debts, the said firms have respectively furnished and delivered certain collateral securities now in the possession of, and held by the said company. And, furthermore, that the said *Hagan, Niven & Co.*, are justly and truly indebted unto the New Orleans Canal and Banking Company, in the full sum of

NEW ORLEANS $26,508 85, for which they have furnished their promissory note, drawn to the
CANAL AND
BANKING COM- order of, and endorsed by the said *Buchanan, Hagan & Co.*, dated on the se-
PANY      cond day of August, 1838, and made payable on the eighth day of August, 1840,
v.
HAGAN.    fixed, to secure the punctual payment of which note, he, the said appearer,
granted a special mortgage in favor of the said New Orleans Canal and Banking,
on certain property situated in this city, by an act passed before *William Chris-
ty*, a notary public in this city, on the second day of August, 1838; and where-
as the said companies have loaned unto him, the said appearer, the aggregate
sum of 32,000, that is to say, the sum of 20,000 by the said Exchange and
Banking Company, and the sum of $12,000 by the said New Orleans Canal
and Banking Company, to secure the payment of which amounts, he, the said
appearer, granted a special mortgage in favor of the said companies respectively,
on certain landed premises, by an act passed before me, notary, on the twenty-
second day of May instant, which loans were made and granted as aforesaid, on
the express condition, and with the understanding, that he, the said appearer,
should still further secure the payment of the debts and liabilities due and owing
by the said firms respectively, to the said companies, as hereinbefore mentioned,
by granting another special mortgage in favor of said companies on the same
landed premises, last above referred to and mentioned.

" Now, therefore, in consideration of the premises, and in order to secure the
full and final payment of the above mentioned and recited debts and liabilities,
within the space and term of three years, to commence and be computed from
the date hereof, he, the said *John Hagan*, moreover declared, that he does, by
these presents, mortgage, affect and specially hypothecate, in favor of the said
Exchange and Banking Company of New Orleans, and New Orleans Canal and
Banking Company, both duly incorporated institutions of this State, in the pro-
portion of the amounts to them respectively due and owing by the above men-
tioned firms, all and singular the following described property, to wit." Then
follows the description of the property, and the act proceeds: " And the said
*John Hagan*, doth hereby bind and obligate himself not to sell, alienate, nor en-
cumber the hereinbefore described and mortgaged premises, nor any part there-
of, to the prejudice of this mortgage. And doth moreover, by these presents,
confess judgment for the amounts of the said debts and liabilities of the said
firms respectively, as hereinbefore set forth and expressed; and agrees that, in
case of non-payment of the same, as herein stipulated, the law in such cases
made and provided, may be strictly enforced and summarily put into execu-
tion. It being, however, agreed and expressly understood by and between the
parties hereto, that the said companies shall not proceed against the said de-
scribed property, and attempt to make the same liable under the present mort-
gage now being granted, until they shall have first exhausted the collaterals and
mortgage securities now in their possession and herein above referred to and
mentioned, or made all due and reasonable efforts to realize and make good the
same."

The Exchange Bank having become insolvent, its affairs were placed in the
hands of commissioners, who, in 1844, made a sale at public auction of its assets.
At this sale *Adams* became the purchaser of four notes of *Thomas Barrett &
Co.*, endorsed by *Hermann, Briggs & Co.*, amounting in all to a principal sum of
$54,850, the whole adjudicated at the price of $210. *Preston* became the
purchaser of two notes of *Buchanan, Hagan & Co.*, endorsed by *Hagan, Niv-
en & Co.*, amounting to a principal sum of $6,100, at the price of $200; of four

notes of *J. B. Marks*, endorsed by *Hagan, Niven & Co.*, amounting to a princi-
pal sum of $1060, at the price of $40; and of a draft of *Buchanan, Hagan & Co.*, on *Redmond*, and *Hagan, Niven & Co.*, for a principal sum of $5,500, at the price of $30. These assets accord with the principal sum of $67,510 claimed by *Adams* and *Preston*, as above stated. After the adjudications, *Adams* and *Preston* entered into an agreement of equal partnership in the assets thus purchased. *Adams*, however, discontinued, as to himself, the claims set up in this suit, during the progress of the trial.

The first point of defence urged by *Hagan* is, that the obligations or debts thus purchased by *Adams* and *Preston*, are not the debts which the mortgage of 25th May, 1839, was given to secure. This point was laboriously contested in the court below. We do not consider it indispensable now to examine it; and assuming, therefore, for the purposes of our present inquiries, the identity of the indebtedness, we proceed to the second point of *Hagan's* defence.

*Preston* contends that the act of 25th May, 1839, imposes on *Hagan* a personal responsibility for the indebtedness of the parties therein recited; *Hagan*, on the contrary, maintains that by that act he did nothing more than mortgage his property.

" It is not necessary that the mortgage should be given by the person contracting the principal obligation; it may be given for the contract of a third person." Civil Code, art. 3262. " When a person has given a mortgage on his property for the obligation of a third party, it is necessary to inquire whether he only gave the mortgage, or whether he bound himself personally for the fulfilment of the obligation." Ibid, art. 3263.

" In the former case, that is if he has only mortgaged his property to secure the fulfilment of an obligation by a third person, no right of action exists against him personally, but merely an action of mortgage against the thing, to have it seized and sold, so that, if it perishes, he who mortgaged it shall be released from every species of obligation." Ibid, art. 3264.

" On the other hand, if the person who has given a mortgage for another, has bound himself personally for the fulfilment of the obligation, independently of the mortgage, there shall exist against him a right of personal action, and he shall not be released, even if the thing mortgaged should perish." Ibid, art. 3265.

The question, then, is a question of intention, to be solved by a just and reasonable interpretation of the whole instrument, and the expressions therein used by the parties. Though the several debtors to the bank, recited in the act, had given notes, *Hagan* was not required to endorse them. In the recitation of the agreement upon which the loans of $12,000 and of $20,000 were made, the language is not that he shall personally bind himself, but that he shall *still further* secure the debts and liabilities of the said firms, by granting another special mortgage in favor of said companies on certain real estate.

The mortgaging clause declares that " in consideration of the premises," that is, the pre-existing agreement thus recited, and in order to secure the full and final payment of those debts of the firms named, he mortgages, affects and specially hypothecates the described property.

In the stipulations for time, it is agreed that the bank shall not proceed against the mortgaged property until the lapse of three years, nor until they shall first exhaust certain collaterals. If *Hagan* had intended to be personally bound, we cannot believe he would have omitted to stipulate for a like freedom from personal pursuit.

NEW ORLEANS   The clause of confession of judgment, is much relied on by *Hagan's* adver-
CANAL AND    sary.   That clause is found in its usual position in the notarial act, to wit, in that
BANKING
COMPANY      portion which provides safeguards and remedies for the enforcement of the mort-
*v.*         gage.   It follows the pact *de non-alienando*, which is a clause intended to relieve
HAGAN.       the mortgagee from the necessity and delay of action against a subsequent pur-
chaser.   The object of the confession clause is to give in distinct terms the
remedy of executory process against the land.   Such a clause does not authorize
a *fieri facias* against the mortgagor's other property, nor a registration in the
nature of a judicial mortgage.   It is, in our opinion, a mere provision that con-
cerns the mortgagee's remedy against the hypothecated property.

Again, in the accepting clause of the act, the language is, the presidents of
the respective banks, &c., " do by these presents accept the foregoing *mortgage*,
with all and singular the rights, benefits and privileges resulting *therefrom.*"

Suretyship is construed strictly.   The law favors the surety.   " Suretyship
cannot be presumed; it ought to be expressed; and is to be restrained within
the limits intended by the contract."   Civil Code, art. 3008.   Suretyship does
not operate a mortgage· on the property of the surety, unless there has been
an express agreement.   Civil Code, art. 3010.   And, by parity of reasoning, a
mortgage of property as security, should not operate the personal responsibility
of the mortgagor, unless so expressly declared.

We, therefore, are of opinion that *Hagan* contracted no personal liability for
the debts thus proposed to be secured.   But, however this may be, the first and
second points above stated are merged in the third point, which we now pro-
ceed to consider.

In opening the argument on the question of usury, the counsel for *Hagan*,
aware that this plea is usually an odious one in public opinion, and is also,
scanned with something like disfavor by courts of equity, has defended the
reputation of his client, by suggesting that *Hagan* has never sought to invalidate,
as he says he might successfully have done, the claim of the Canal Bank for its.
full debt of $12,000, and eight per cent interest, and that he has only taken.
refuge under this plea, at a late period of the trial, to aid himself in resisting a
vigorous effort made by his adversary to impose· upon him a personal liability for
debts amounting, in principal alone, to $67,510, and bought by his antagonists
for $470.   This is a question which concerns the reputation of *Hagan*, rather
than the legal merits of this controversy; but it is perhaps just to say in passing,
that the remarks of the counsel with regard to his client's motives and conduct,
seem justified by the record.

The intervenor has strenuously contended that a lawful consideration for the
mortgage of 25th May, 1839, is to be found in the delay which he says is ac-
corded to the embarrassed merchants, the friends and relatives of *Hagan*, whose·
debts are thereby secured.   An examination of the act has not satisfied us that
such delay was thereby stipulated in favor of those parties.   It is true that, under
the article of the Code which he has cited, a person may, in·his own name, make·
some advantage for a third person the condition or consideration of a commuta-
tive contract; and, if such third person consents to avail himself of the advan-
tage stipulated in his favor, the contract cannot be revoked.   But has there been
such a stipulation here?   The stipulation is "that the said companies shall not
proceed against the said described property, and attempt to make the same lia-
ble, under the present mortgage now being granted, until they shall have first
exhausted the collaterals and mortgage securities now in their possession, and.

herein above referred to and mentioned, or made all due and reasonable efforts <span style="float:right">NEW ORLEANS</span> to realize and make good the same." In a preceding part of the act, upon which <span style="float:right">CANAL AND BANKING</span> the counsel relies, is also to be found this expression: "To secure the full and <span style="float:right">COMPANY.</span> final payment of the debts and liabilities of the firms within three years from the <span style="float:right">*v.*<br>HAGAN.</span> 25th May, 1845," *Hagan* grants the mortgage, &c.

We do not see in these expressions and stipulations a contract by the banks which would have inhibited them from immediate action against those debtors. The natural and fair construction is this: I, *Hagan*, for the loan you have given me, not only have promised to pay the loan, and seven per cent interest, but I also agreed to give, and now give you a mortgage on my own property to secure the full and final payment of the debts due by the firms mentioned; but you must not resort instantly to my property, but only after a certain period, and after having done your best to exhaust other securities.

In defining the nature and extent of suretyship, our law expressly declares that, while it cannot be contracted under more onerous conditions than are imposed on the principal debtor, yet it may be under more favorable conditions. *Si ille pure promisserit, fidejussor sub conditione promittere potest. Non solum autem in quantitate, sed etiam in tempore minus aut plus intelligitur. Plus est enim statim aliquid dare; minus est post tempus dare.* There is nothing in the instrument which shows an intention on the part of either *Hagan* or the banks, to disarm them of their power against the principal debtors.

Not only is there no delay given to these debtors, and no statement in the act of mortgage that such delay is its consideration, but the mortgagor and the mortgagees have themselves declared, in express and unequivocal terms, which exclude all implication and conjecture, the real and true consideration for which the mortgage was given. The act announces in language susceptible of no misconstruction, that the loans of the 22d May, 1835, "were made and granted as aforesaid on the express condition, and with the understanding, that he, the said appearer, should still further secure the payment of the debts and liabilities due and owing by the said firms respectively to the said companies, as herein before mentioned, by granting another special mortgage in favor of said companies on the same landed premises last above referred to and mentioned. Now, therefore, in consideration of the premises," &c., *Hagan*, to secure the debts, &c., mortgages, &c.

The mortgage, then, is given in fulfilment of the recited promise, and its consideration is the loans made on the 22d May, three days previous. What, then, was the consideration given by *Hagan*, for the loan made to him by the Exchange Bank?

1st. He promises to pay, at the end of one year, the principal sum loaned.

2d. He promises to pay seven per cent interest on said principal sum.

3d. He gives a mortgage on lands to secure the payment of principal and interest.

4th. He promises (and three days after fulfils that promise,) to give the Exchange Bank a mortgage on the same lands, to further secure the payment of the debts of third persons to said bank, amounting to $81,000.

Is this last branch of the contract, to wit, the mortgage to secure the payment of those debts due by third persons, void?

The charter of the Exchange Bank contains the following provisions: "That the said company shall not take more than seven per centum per annum upon any of its loans or discounts; nor shall it take more than six per centum per

annum upon any of its loans or discounts made on promissory notes, which shall be payable at four months, or less, after such loan or discount."

According to all reasonable rules of interpretation, we consider an agreement to take, and a taking, as equally covered by the statute. The bank, then, is not only incapable of making an agreement to take more than seven per cent interest on a loan, but it is prohibited from so doing. The statute is a prohibitory statute. It rests on grave considerations of public policy, and whether that policy be unsound, as the counsel suggests in argument, or sound, we are not permitted to enquire. Being a prohibitory statue, if the agreement made by *Hagan*, to give the mortgage of the 25th May, and the subsequent execution of that agreement, be an evasion of, and a fraud upon the statute, no court of justice can enforce it.

Is it, then, such a violation? The mere statement of the case carries its own answer with it. The bank stipulated for seven per cent interest; in stipulating that the further mortgage should be given, it stipulated for something more than seven per cent interest, and when that stipulation was fulfilled, three day's afterwards, it received more. It received a mortgage for the further security of $81,000, due to it by third persons.

" A profit made, or loss imposed upon the necessities of the borrower, whatever form, shape, or disguise it may assume, where the treaty is for a loan, and the capital is to be returned at all events, has always been adjudged to be so much profit upon a loan ; and to be a violation of those laws which limit the lender to a specified rate of interest." *Owen's* case, 2 Peters, 537.

Here the bank, taking advantage of the necessities of *Hagan*, who was pressed with an enormous load of debts, and particularly by a debt to *Le Breton*, of $36,000, maturing in the latter part of May, 1839, the price of the land subsequently mortgaged to the bank, extorts from him, in addition to the highest rate of interest allowed by its charter, a mortgage for an enormous debt due by third persons. That the partners in these houses were, as suggested by the intervenor, *Hagan's* relatives and friends, makes the case against the bank stronger rather than weaker, since, as we have seen, there was no stipulation for their benefit. It was taking advantage not only of *Hagan's* necessities, but of his affection and family pride.

There can be no legal remedy for that which is illegal, and as the Exchange Bank could not have enforced this mortgage, the intervenor, supposing him to have purchased the rights intended to be conferred by the hypothecary contract of *Hagan*, can stand in no better position. " No court of justice," said the learned judge in *Owens'* case, " can be made the handmaid of iniquity. Instituted to carry into effect the laws of a country, how can it become auxiliary to the consummation of violations of law ?"

In principle, it is impossible to distinguish *Owens'* case from the present. The Bank of the United States, as the Exchange Bank, was prohibited from taking more than a certain rate. By the discount of the note, she did evasively take a greater rate by a profit on depreciated paper given to the borrower at its nominal value, instead of cash, and the case was decided upon the prohibitory clause in the charter, and without reference to the usury laws of Kentucky, where the contract was made.                    *Judgment affirmed.*