Plaintiff instituted this suit against T.G. Kidd, a laundry driver and former employee of plaintiff, and his surety or bondsman, H.A. Sherman. The alleged indebtedness arose out of a shortage in Kidd's account with plaintiff. It was the duty of Kidd under his employment to solicit laundry, dry cleaning, etc., for plaintiff, to pick it up, deliver it and to collect for the services. The contract sued on was entered into by plaintiff, Kidd and his bondsman or guarantor on August 4, 1934, and is as follows:
"This agreement entered into by and between Shreveport Laundries, Inc., a Louisiana corporation domiciled in the City of Shreveport, Louisiana, (hereinafter called the `Company'), party of the first part, and T.G. Kidd, a resident of Shreveport, Louisiana, (hereinafter called the `Solicitor'), party of the second part, Witnesseth:
"1. The Company hereby employs the Solicitor to solicit customers for laundry, dry cleaning and other services performed by it, to receive from and deliver to such customers all clothing and other articles the subject of such services, and to collect all amounts due the Company for such services from such customers.
"2. The Company agrees to pay the Solicitor a commission of 20% as compensation when the business does not amount to $75.00 in any week. When the business done in any week amounts to over $75.00 the Company agrees to pay the Solicitor a fixed salary of $20.00 per week, plus an additional compensation of 15% of any amount in excess of $100.00 per week collected by him for services of the Company in any week.
"3. The Solicitor agrees to perform the duties set forth in section First hereof and such duties reasonably incidental thereto as the Company may from time to time specify; to conduct himself in an honest, sober and industrious manner; to devote all of his working time to the Company, to fully account each week to the Company for all laundry, cleaning, dyeing and other work delivered by him, less the salary and commission on such delivered work that he is authorized to retain under this contract; to make all reasonable efforts to build up and advance the business of the Company, to preserve in the strictest confidence the business methods and practices of the Company; and the names and addresses of its customers and prospective customers; and to comply with all of the rules, regulations and practices of the Company.
"4. The Company will place in the charge of the Solicitor a particular route or routes which may at any time be changed by the Company. The Solicitor shall, at all times, unless otherwise expressly permitted or directed by the Company, confine solicitation to customers and prospective customers situated along or within the route or routes then in charge of the Solicitor.
"5. The parties hereto recognize that the Solicitor while in the employ of the Company necessarily obtains an intimate knowledge of its business methods and practices and attracts to himself as a representative of the Company a large amount of the patronage and good will of the customers situated along such route or routes as may from time to time be placed in charge of the Solicitor by the Company.
"The parties further recognize the fact that because of the manner in which the business of the Company is conducted and also because the efforts of the Company are directed towards acquiring for the Solicitor as its agent, the patronage and good will of the customers who live along the routes as the Solicitor may from time to time be employed upon, the Solicitor is peculiarly qualified to damage the business of the Company by entering the employ of a competitor or by seeking to divert the business of the Company or a part thereof to a competitor of the Company.
"The parties hereto further recognize the fact that the special training and assistance given to the Solicitor from time *Page 435 
to time by the Company and the information imparted to him through its efforts and which he is permitted to acquire as to its business methods are intended to be for the benefit of the Company, so that the Solicitor is without right to use such information or to divert such good will and patronage to a competitor of the Company, except after a reasonable time shall have been given the Company to train another man to take the Solicitor's place upon the termination of this contract and to retain through such other men the benefits of the patronage and good will that it has built up through the instrumentality of the Solicitor, including that which has been acquired for the Company by the efforts of the Solicitor while in its employ; and the parties to the contract have determined that six months is a reasonable period within which the Company should be able to accomplish this result in the absence of interference with or opposition from the Solicitor.
"The parties hereto further recognize the fact that the only practical way in which the Solicitor can be prevented from using for the benefit of a competitor the confidential information obtained during his employment by the Company and from diverting to a competitor the patronage and good will of the Company's customers, special knowledge about whom has been acquired by him in the Company's employ, is by prohibiting the Solicitor from entering the employ of a competitor or from engaging himself in competition with the Company for a period of six months from the termination of this contract.
"It is therefore agreed by the Solicitor that he will not for a period of six months after the termination of this agreement, whatever be the reason for such termination.
"(a) For himself or in association with other persons or as an employee of any other person, firm or corporation, or in any way or capacity whatsoever within the City of Shreveport and a radius of 100 miles therefrom, solicit any customers for laundry, dry cleaning or other services being rendered by the Company at the date of such termination;
"(b) In any way, directly or indirectly, divert, take away or interfere with or attempt to divert, take away or interfere with any of the customers of the Company, either for the benefit of a competitor or out of ill will to the Company or for any other reason whatsoever.
"(c) In any capacity enter the employ or become associated with any competitor of the Company or himself engage in business in competition with the Company.
"6. The Solicitor shall be responsible for the payment by all of the customers along the route or routes from time to time entrusted to him for all services performed by the Company, except in the case of customers having charge accounts with the Company. The Solicitor shall make a proper accounting for all sums due by him under this section whenever so requested by the Company.
"7. This agreement shall remain in effect for one year and thereafter from year to year, unless before the end of any year either party gives notice of termination to the other. At any time, however, either party may terminate this agreement by giving the other party at least one week's notice to that effect and the Company may, at any time, terminate this agreement without any notice in the event of the Solicitor's failure to comply with the terms and provisions thereof. On the termination of this agreement for any cause, the Solicitor shall forthwith deliver to the Company all books, papers, orders, lists of names and addresses of customers and prospective customers in his possession, and any and all property in his possession, of every nature, sort or kind, belonging to the Company. The covenants on the part of the Solicitor set forth in Section 5 hereof shall survive any termination of this agreement, whether on expiration of any year, or on notice of either party or otherwise. The termination of this agreement for any cause shall not relieve the Solicitor from any liability to the Company which has theretofore arisen under any of the provisions hereof.
"8. And now to these presents comes and intervenes H.A. Sherman, who resides at Bossier City, La., and who for value received, guarantees to the Company the faithful performance by the solicitor of all the covenants on the part of the solicitor herein contained, and the faithful payment by the solicitor of all the money due by him to the Company. This guaranty shall be a continuing guaranty, and should this agreement be terminated and the solicitor be again employed by the Company, said guarantor shall be *Page 436 
liable as if this agreement had continued in effect. Said guarantor hereby waives all pleas of division and discussion and agrees that his liability hereon is and shall be in solido with the solicitor. The guarantor shall not be liable under this agreement for a greater sum than $300.00.
"All of these parties hereto agree that in the event of the transfer and conveyance of the business and property of the Company, either by way of sale or merger or consolidation with corporations, then and in that event the vendee or transferee of the Company, or the merged or consolidated corporation of which it become a part, shall be substituted for the Company in this contract in all respects as though this contract had never been originally entered into with such vendee or transferee or consolidated corporation."
Plaintiff alleged that in Kidd's settlement with it on November 2, 1940, he failed to pay the balance of $290.15 due petitioner under said contract; and that he left plaintiff's employ at that time.
Defendant Kidd made no appearance and judgment against him was taken by default. Defendant Sherman answered denying he owed plaintiff anything and set up the following defenses:
"10. Further answering, H.A. Sherman, your respondent, shows that sometime during the month of July, 1934, the said T.G. Kidd was employed by the Pennington New Way Laundry and that your respondent, H.A. Sherman, did guarantee to the Pennington New Way Laundry the faithful performance by T.G. Kidd of his covenants and the faithful payment by T.G. Kidd of any monies due him to the Pennington New Way, but that the said T.G. Kidd's employment was terminated after one week's time with the Pennington New Way Laundry, and that the said T.G. Kidd thereafter went to work for the Ideal Laundry and worked with said Ideal Laundry until June of 1939, and in this connection your respondent, H.A. Sherman shows that it was never his intention to execute a bond or any obligation that would guarantee the faithful performance of the services of T.G. Kidd to any laundry other than the Pennington New Way Laundry.
"11. Further answering your respondent, H.A. Sherman, shows that the bond executed by him on August 4, 1934, which bond is attached to plaintiff's petition, was without consideration to him and for that reason is null, void and of no effect.
"12. Further answering, your respondent, H.A. Sherman, shows that such a guarantee agreement and contract of employment, which is attached to plaintiff's petition, is contrary to the public policy of the State of Louisiana, and for that reason is null, void and of no effect.
"13. In the alternative and only in the alternative, and should the Court hold that said guarantee agreement, which is attached to plaintiff's petition, is valid, legal and binding, then and in that event your respondent, H.A. Sherman, shows that the said agreement was executed in August, 1934, and that it was never his intention that the said agreement should be continuing from that date up to the present but that it was his intention that said agreement should be binding only so long as the said T.G. Kidd was employed by the Pennington New Way Laundry.
"Wherefore, your respondent, H.A. Sherman, prays that after a hearing duly had that there be judgment herein in his favor and against the plaintiff, Shreveport Laundries, Inc., rejecting their demands against him at their cost."
Sherman, who is the only defendant now before the court and will be so treated hereafter, also filed exceptions of no cause and no right of action, which were argued and submitted but never directly passed upon by the lower court. The court below first rendered judgment for plaintiff as prayed for. It later granted a rehearing and reversed its former judgment and rejected plaintiff's demands. It is from that judgment plaintiff is prosecuting this appeal.
Defendant reurges here his exceptions of no cause and no right of action. They are based upon the theory that the contract is null and void for the reason no consideration is shown to have been paid either Kidd or Sherman for signing the contract. This contention is based upon our finding in the case of Shreveport Laundries, Inc., v. Teagle, 139 So. 563. The only part of the contract (which was the same as the one before us now) in contest in that case was paragraph 5 wherein the employee, Teagle, agreed not to solicit laundry in the same territory for a period of six months after ceasing his employment with the Shreveport Laundries, Inc. Certainly the nullity of this paragraph of the contract did not affect *Page 437 
the contract as to the services Teagle agreed to perform for the Shreveport Laundries, Inc., while in its employ and the salary or commission he was to receive for that service. In the Teagle case we did not find the entire contract to be a nullity and unenforceable.
There can be no dispute relative to the contract in the case at bar carrying a just consideration for the services agreed to be rendered by Kidd while in the employ of plaintiff. Although the record fails to show that Sherman was paid any consideration for signing as bondsman or guarantor of Kidd, it is evident that Kidd would not have been employed if Sherman or some other bondsman had not signed the contract guaranteeing his fidelity. There is no evidence in the record to throw any light on any transaction regarding the bond as between Sherman and Kidd. Insofar as plaintiff is concerned Sherman is bound unless he has been released by law or by some act of plaintiff.
The exceptions of no cause and no right of action are therefore overruled.
The record discloses that the Shreveport Laundries, Inc., owns and operates the Excelsior Laundry, the Ideal Laundry and several others. Each is operated as a separate establishment. Each employs its own help and makes contracts with its employees. This is shown by the Manager of the Excelsior Laundry in his testimony, which is as follows:
"Q. How long had Mr. Kidd worked for you? A. Forty-seven weeks — that is the amount we collected each week one dollar —
"Q. Forty-seven weeks? A. Yes.
"Q. Do you know who he worked for prior to the time he came to work for the Excelsior? A. Ideal.
"Q. Was it necessary for him to quit the employment of the Ideal before coming to work for the Excelsior? A. He had to quit, he could not work for both at the same time.
"Q. It was necessary for him to sever his relations with the corporation or the company for which he was working? A. He quit and came over and said he wanted to work for my company, and all things being agreeable, he was not working there any more, I give him the right.
"Q. That would involve a new contract with you? A. No, I found the bond had been signed and taken it to be a legitimate bond and I accepted that.
"Q. Didn't you change the contract of employment with him? A. No.
"Q. And agree to pay him 35%? A. He was paid no more than the contract called for because he took a country route.
"Q. And you agreed also that he would buy his own gas and oil? A. Yes.
"Q. You were operating on a different basis? A. Under a better one.
"Q. We don't care whether it was better or not, you were operating on a different basis? A. You can call it different."
Kidd worked for the Ideal Laundry for several years under the contract sued on in this case and which we have quoted in full, before he went to work for the Excelsior Laundry. He was not short or behind in his accounts when he left the Ideal. All of the shortage claimed by plaintiff arose during the last four or five weeks he worked there. On November 28, 1939, soon after Kidd was employed by the Excelsior Laundry, its Manager addressed the following letter to H.A. Sherman, the defendant herein:
"Some time ago you endorsed a bond for Mr. T. Kidd while he was in the employ of the Ideal Laundry.
"We have employed Mr. Kidd as routeman and are writing to ask if your endorsement of previous bond will be satisfactory with you under his present employment.
"We feel confident that Mr. Kidd is honest in every respect, but it is a matter of form with us to have bonds on each man working for us.
"Thanking you for your prompt reply."
On the lower left hand corner of the letter the following notation was made by H.A. Sherman and the letter returned to the Excelsior Laundry:
"11-30-39.
"Above O.K.
"Yours, H.A. Sherman."
The contract under which Kidd worked for the Excelsior Laundry was different in many respects from the original contract on which Sherman became a surety or bondsman. Under the original contract Kidd was to receive 20% commission when his business did not amount to $75 *Page 438 
per week and to receive a salary of $20 per week when the business he did exceeded $75 per week and in addition was to receive 15% on any amount in excess of $100 per week. Under this contract plaintiff furnished the gas and oil to operate the truck. The contract under which Kidd worked for the Excelsior Laundry provided that he was to receive a straight 35% of all business done by him. He was to buy the gas and oil with which to operate the truck and was to deposit with plaintiff $1 each week as a bond. Under the original contract Kidd worked a route in the City of Shreveport and under the contract with the Excelsior he worked a country route. It is defendant's contention here that this change in contract was without his knowledge or consent and therefore he is relieved as surety or guarantor on the contract; that he was only bound under the contract as originally written.
The law is clear that a surety has the right to stand on the terms of his contract and if a creditor makes any change without his consent, even though it is beneficial to the surety, he is released. Revised Civil Code, Art. 3039; Southern Builders' Material Co., Inc., v. Foto et al., 11 La.App. 255, 122 So. 914; McGuire v. Wooldridge, 6 Rob. 47, 50; Insurance Company v. Randall, 42 La.Ann. 260, 7 So. 679; Orleans J. Ry. Co. v. International Const. Company, 113 La. 409, 413, 37 So. 10, 11; Savings Homestead Ass'n v. Frank, 146 La. 198, 83 So. 491.
It is plaintiff's contention that for defendant to avail himself of this defense he must first specially plead it and in the case at bar he has failed to so plead. It relies on the following cases to support its contention: Templeman Bros. Lumber Co. v. Sinnot, 9 Orleans App. 305; New Orleans Gas Light 
Banking Co. v. Hudson, 5 Rob. 486; Byrne v. Hibernia Nat. Bank, 31 La.Ann. 81.
These cases hold that matters of defense which must be specially pleaded are those set up in avoidance or extinguishment of an obligation admitted or proved to have once existed. This rule of pleading is sound. Code of Practice, Art. 327. In the case at bar defendant admits signing the original bond, the one attached to plaintiff's petition. He has not pleaded release because of change of the original contract in any of the respects which we have found it was changed. He alleged that he did guarantee to the Pennington New Way Laundry the fidelity of T.G. Kidd for whom he alleged Kidd first went to work under the contract involved here. He further alleged that Kidd ceased working for the Pennington New Way Laundry after one week and went to work for the Ideal Laundry and that he never intended to execute a bond to cover any work performed by Kidd except when working for the Pennington New Way Laundry.
This contention of defendant is not borne out in any way by the record. Neither Kidd nor Sherman testified in the case, in fact defendant did not offer any evidence. The record clearly shows that the contract signed by Kidd and by Sherman as surety was one between them and the Shreveport Laundries, Inc. No mention of any laundry is made in the contract. When Kidd went to work for the Excelsior Laundry in 1939, Sherman in substance agreed that the bond he had formerly executed was to remain in force and effect.
There is no evidence in the record to show that Sherman did or did not have knowledge of the change made in the contract. The Manager of the Excelsior Laundry testified that he never saw Sherman until the time he made demand for the payment of the shortage due by Kidd. The letter written by the Manager to Sherman regarding the contract did not make mention of any change in it. Defendant objected to the introduction of it in evidence for the reason there was no allegation by plaintiff that the new contract had been ratified by Sherman. The letter was admissible for the purpose of contradicting the allegations of defendant's answer wherein he alleged he had no intention of guaranteeing the fidelity of Kidd to any other than the Pennington New Way Laundry. It does not show the ratification of the new contract for the reason the letter does not set out the changed conditions and terms of that contract.
Plaintiff sued on the original contract, which is attached to and made part of its petition, and in answer to a prayer for oyer filed certain weekly settlement sheets showing the account of Kidd with the Excelsior Laundry. The settlement sheets filed, except as to figures, are the same. *Page 439 
We will quote one for the purpose of showing what they contain:
$233.39
"To balance from last week ............................ 30.50 To new business this week ............................. 91.00 By salary ............................................. 18.66 By commission ......................................... ------- By expense ............................................ 12.29 By overcharge ......................................... 2.25 By deadhead ........................................... -------- By balance forward O.K. ............................... 28.04 Total credit .......................................... 61.54 -------- Amount cost due ....................................... 283.35"
The item of expense of $12.29 is broken down as follows:
"Commission ........................................... $ 2.00 Gasoline and oil ..................................... 7.29 Incidental expenses .................................. 3.00 ------- Total ................................................ 12.29"
On trial of the case plaintiff, although suing on the original contract, proved its claim under a different contract as herein set out. It contends that the evidence was admissible for the purpose of proving its claims and therefore did not enlarge the pleadings. An objection to the testimony by defendant on the ground that it enlarged the pleadings, in our opinion, would have been sustained. It was not objected to and when plaintiff offered this proof of a contract different from the one signed by Sherman it enlarged the pleadings for all purposes and defendant is not cut off because of insufficiency of pleadings from raising the defense that the contract was changed and is not the one on which he bound himself. Furthermore, on cross-examination defendant's counsel asked many questions to show that the contract under which plaintiff was claiming was not the same contract he had signed. These questions, which elicited replies showing the changed contract, were without objection from plaintiff. It is our opinion that the issues as reflected by the pleadings were thereby enlarged.
Regardless of this fact, for plaintiff to recover it must show that defendant Sherman bound himself as surety or guarantor on the contract under which it is attempting to recover. Art. 3039, Revised Civil Code; Bell v. Norwood, 7 La. 103; McGuire v. Wooldridge, supra; New Orleans Canal Banking Co. v. Hagan, 1 La.Ann. 62, 66; Grieff v. Kirk, 17 La.Ann. 25, 26; Lachman v. Block, 47 La.Ann. 505, 508, 17 So. 153, 28 L.R.A. 255; Orleans 
J. Ry. Co. v. International Const. Co., 113 La. 409, 413, 37 So. 10, 11; Wells v. Fidelity Deposit Co. of Maryland, 146 La. 169, 83 So. 448.
The surety has the right to stand upon the very terms of the contract even though he should be benefited by the change. Suretyship is construed strictly and there are no presumptions against the surety.
Plaintiff has failed to show that Sherman ever bound himself at any time as surety on the contract on which plaintiff is attempting to recover and therefore it cannot recover against him.
The judgment of the lower court is correct and it is affirmed, with costs. *Page 626