BOUTALL, Judge:
The First National Bank of Jefferson Parish brought suit on a promissory note against a number of makers, guarantors, and others for the balance due. Several of the defendants filed third-party demands and reconventional demands against each other. The primary appeal is by those defendants who executed continuing guaranties and were found liable in solido for the amount prayed. One of the third-party defendants who was cast in indemnity for the liability of one of the continuing guarantors has also appealed.
The facts are as follows: The Louisiana Purchase Corporation, with whom all of the defendants were associated at one time or another, sought a line of credit with The First National Bank of Jefferson Parish in order to develop a real estate project it had under way. Initially there was a loan for $10,000 secured by some continuing guaranties, but as the corporation continued to borrow money it was decided that there would be a credit limit of $50,000, and additional continuing guaranties and other se *347 curity was furnished. Several promissory notes were made and renewed, with the additional amounts borrowed, and the culmination of these transactions was that the bank held a promissory note dated November 8, 1971 signed by Louisiana Purchase Corporation in the amount of $38,950.72 (Thirty Eight Thousand, Nine Hundred Fifty and 72/100 Dollars) [the note sued upon] with a principal balance due of $37,192.09. This note was secured by a mortgage in the amount of $50,000 in favor of John A. Beni-nate, held in pledge, and the continuing guaranties in the amount of $50,000 each executed by Ken J. LaGrue, Kenneth Whitfield, Eugene E. Schaefer, Jr., William Campbell, Michael Bruno and John A. Beni-nate. These guarantors, with the exception of Whitfield, have appealed asserting that, although they signed the guaranties in question, the bank has discharged them by its actions in extending the terms of the note, and releasing other securities on the note (a partial release of the $50,000 mortgage, and release of certain other mortgage notes) all without notice to the continuing guarantors and in prejudice of their ability to be repaid.
The relationship between the creditor bank and each debtor who signed the continuing guaranty is governed by the provisions of that document. L.C.C. Art. 1901 provides that agreements legally entered into have the effect of law on those who have formed them. L.C.C. Art. 3039 provides that suretyship must be expressed, and is to be restrained within the limits intended by the contract.
Each appellant has admitted execution of his continuing guaranty for $50,000. The specific language contained in the continuing guaranty binds the signer in solido with the debtor for the payment of the indebtedness precisely as if the debt had been contracted and was due and owing by the signer in person. It further made the signer a party to the note, waived notice and permitted the bank in its judgment to grant extensions, take and give up securities, accept compositions, grant release and discharges, make changes of any sort whatever in the terms of its contract and apply all monies received from the debtor or other securities as it may think best.[1] By its terms the document provides that the bank may do exactly what it did in releasing the mortgage notes held as security, effecting a partial release of the mortgage, and extending and renewing the promissory note in the principal amount due. Additionally, we should point out that the mortgage notes alleged to be released were not held as security for the note sued upon, but were actually held as security upon another note of Louisiana Purchase which was paid in full with the proceeds from the release.
It is contended however that these provisions in the continuing guaranty are contrary to express provisions of Louisiana Civil Code, which constitute prohibitory laws, such that the provisions thereof cannot be waived or contracted against. Louisiana Civil Code Articles 11 and 12, E. L. Burns Company, Inc. v. Anthony Cashio Construction Company, 302 So.2d 297 (La.1974). Appellants insist that Louisiana Civil Code Articles 3060, 3061, and 3063 govern the issues before us and that they, as sureties are discharged.[2] They additionally refer us to the cases of Glass v. McLendon, 66 *348 So.2d 369 (La.App. 2d 1953); Shreveport Laundries, Inc. v. Sherman, 7 So.2d 433 (La.App. 2d 1942); and cases cited therein.
While we agree that the above quoted authorities regulate the provisions of suretyship, we point out that these appellants are not simple sureties but are debtors in solido with the principal debtor. We refer to the case of Louisiana Bank & Trust Company v. Bouttee, 309 So.2d 274 (La.1975); Louisiana Revised Civil Code Article 3045, and 2 Planiol, 768. When a solidary surety in executing a continuing guaranty instrument agrees that the creditor might, without notice, accept securities and grant releases and discharges, apply money and securities as it saw fit, without in any way affecting or lessening liability of guarantors, this was an effective waiver of any rights of simple surety claimed by a solidary surety. See also American Bank & Trust Company v. Blue Bird Restaurant & Lounge, Inc., 279 So.2d 720 (La.App. 1st 1973), affirmed 290 So.2d 302 (La.1974).
We find no error in the ruling of the trial judge casting these appellants as liable for the principal demand of the plaintiff bank, and we affirm as to that.
Before REDMANN, LEMMON, STOULIG, BOUTALL and SCHOTT, JJ.
SCHOTT, Judge:
U. L. Roy has appealed from the judgment against him in favor of Eugene E. Schaefer, Jr., for full indemnification for Schaefer’s liability to the bank on the main demand and dismissing Roy’s reconventional demand against Schaefer.
Schaefer’s third-party demand was based on a written agreement dated October 1, 1971, reading as follows:
“It is mutually agreed by the undersigned, E. E. Schaefer, Jr. and U. L. Roy, that the following terms and conditions of this contract represent the full agreement between them and constitutes the full consideration of each to the other.
1. U. L. Roy agrees to secure a complete release of liability of Schaefer for personal endorsements of mortgages granted by the Louisiana Purchase Corp. to the Fidelity Mortgage Investors, Succession of P. H. Corbett and the First National Bank of Jefferson.
2. Roy agrees to cause the Louisiana Purchase Corp. to issue to Schaefer a hold harmless agreement regarding the liability of Schaefer for his personal endorsement of the mortgage granted by Louisiana Purchase to United Ventures Corp. in the principal amount of $125,000.00. Said hold harmless agreement is to remain in full force and effect until a complete release of Schaefer’s endorsement can be obtained.
3. Roy agrees to cause the Louisiana Purchase Corp. to issue to Schaefer as compensation, one promissory note in the amount of $7,500.00 and payable over four equal monthly payments beginning October 1, 1972. Said payments are to be made in either cash or first mortgage notes with full recourse of payment or substitution.
4. Schaefer hereby agrees to deliver to Roy, without additional payment or consideration other than listed above, any and all shares he may own in the Louisiana Purchase Corp. if any have been issued to him.
5. Schaefer hereby agrees that the proxy rights to vote the shares of W. T. Campbell in the Louisiana Purchase Corp. are cancelled and of no further force or effect, said rights having been granted in the contract and agreement dated March 1, 1971.
*349 6. Schaefer agrees that this contract supersedes any and all agreements and contracts between him and the Louisiana Purchase Corp.”
Schaefer’s position is that the agreement required Roy to secure the former’s release from liability to the bank and Roy’s failure to accomplish this made him liable to Schae-fer for the amount of Schaefer’s liability to the bank.
Roy defended on the basis that there was a failure of consideration in that the stock was never delivered and that the agreement did not contemplate that he would be substituted in place of Schaefer for his liability to the bank.
The agreement sued upon should be the law between these parties and this case would be easy to decide if the agreement were clear on its face. Unfortunately, it is so drawn that it cannot be interpreted and enforced without reliance to some extent on the testimony of the parties to the agreement. Schaefer’s counsel in oral argument to this court took the position that this agreement was drawn by Roy so that any ambiguities or failures in the agreement should be construed against him, but we find no evidence in this record to show that the agreement was drawn by Roy.
In numbered paragraph 1 of the agreement the parties speak of Roy securing a release of Schaefer’s liability on “mortgages” granted by Louisiana Purchase to First National Bank of Jefferson and others. The note sued on in this case is not a mortgage note, and while we have no difficulty deciding that the parties intended to cover this particular obligation sued on when they used the term “mortgages” this demonstrates the agreement’s lack of quality from the standpoint of draftmanship.
Numbered paragraph 1 should be contrasted with numbered paragraph 2 in that the latter specifically outlines that Roy will cause Louisiana Purchase to obtain for Schaefer “a hold harmless agreement” as to Schaefer’s personal endorsement of a mortgage by Louisiana Purchase to United Ventures Corporation. This demonstrates that the parties realized what a hold harmless agreement was and with respect to this particular liability they intended for Schae-fer to be indemnified. On the other hand, they said nothing about a hold harmless agreement in the first paragraph where Roy committed himself to get releases for Schaefer with respect to the other creditors, raising a serious question that they intended indemnity by Roy in favor of Schaefer as to these claims.
Paragraph numbered 4 of the agreement is perhaps the most difficult of all to understand and therefore the most dependent on the testimony of the parties for an explanation. The agreement is that Schaefer is to deliver to Roy “any and all shares he may own in the Louisiana Purchase Corp. if any have been issued to him.” Does this mean that Schaefer owns any stock in the company? If so, why the qualification as to stock which “he may own” and “if any have been issued to him?” If it was the intention to deliver stock contemporaneously with the signing of this agreement Schaefer necessarily had to have the stock in hand to accomplish delivery, and yet there is the qualification in the agreement to the effect that he may not have any stock issued to him at that time.
Since Schaefer is seeking to enforce the agreement, the burden of proof is on him. He has taken the position in this court that mere credibility calls and factual issued are involved so that we should not reverse the trial court in the absence of manifest error. This is obviously an oversimplification. Since his testimony of what he did on October 1,1971, is contradicted by the agreement he signed he had to provide a reasonable explanation for the discrepancy. If the explanation was unreasonable we must reach a different result than did the trial judge. Furthermore, if Schaefer’s testimony was obviously and clearly self contradictory, we must set the judgment of the trial court aside where such testimony is the only basis for his case.
The trial judge evidently rejected the testimony of Roy and L. S. Hiern and accepted the testimony of Schaefer to the effect that *350 at the time this agreement was confected Schaefer handed to Roy an envelope containing his stock in Louisiana Purchase. This raised the obvious question on cross examination as to why the agreement contains the words, with respect to the stock, “if any have been issued to him,” and his explanation follows:
“For the very simple reason, as I explained to you before, when I made the endorsement contract with FMI, Louisiana Purchase, at that time, should have executed stock to me under the agreement for my endorsement. Mr. Campbell signed the stock certificates and Mr. Hiern refused to do so, so there may have been a question in Mr. Roy’s mind at that time.”
He had previously testified that when he came into the company originally in June, 1971, it was agreed that he would endorse the corporation note to Fidelity Mortgage Investors in the amount of $1,750,000 in exchange for which he was to be given 250,000 shares of stock and a proxy to vote the stock of William T. Campbell. At that time Hiern was president and Campbell was secretary-treasurer. The question was put to him by his attorney:
“Did you subsequently become the owner of the stock that was to be issued to you in conformity with the endorsement agreement?”
He answered:
“Yes, sir. But not until the time that Mr. Whitfield and myself assumed the presidency and secretary-treasurer of the corporation.”
He further testified that when the stock was issued to him in September, 1971, he and Kenneth Whitfield became the president and secretary of the corporation respectively. Yet in attempting to explain the meaning of the words in the agreement sued on “if any have been issued to him” he talked about Hiern’s refusal to sign stock certificates. Not only is this directly contradictory testimony but it also defies explanation because there was no reason for him to require Hiern’s signature on the stock certificates once he became president in Hiern’s place. In addition, Schaefer testified on direct examination as follows:
“Q. And on what date did you resign as the President of the corporation?
A. I resigned effective that date, October 1.
Q. Did you have any further connection with Louisiana Purchase, either as an officer or a stockholder or the owner of a proxy, after October 1, 1971, the date that you transferred that to Mr. Roy?
A. No, sir. I did not.
Q. Did you ever vote any stock in Louisiana Purchase after October 1, 1971?
A. Me myself?
Q. Yes.
A. No, sir. Not as Eugene E. Schae-fer, Jr. No, sir.
Q. Did you ever vote a proxy. I’m speaking about Mr. Campbell’s proxy?
A. No, sir.”
Ón cross examination, Schaefer was confronted with a document entitled “Majority Consent to Corporate Action.” It recited in its preamble: “The stockholders hereinafter signing their names vote their respective shares of stock for the following corporate action and individually agree to the following terms and conditions, to wit:” The agreement then authorized Louisiana Purchase Corporation to sell some of its property and authorized L. S. Hiern to have recorded mortgages cancelled against the property. The agreement continued:
“3. Louisiana Purchase Corporation hereby authorizes and permits each of its stockholders to receive unencumbered lots in Additions I and/or II of Hillcrest Country Club Estates from Housemaster Corporation in full satisfaction of any and all claims, interest and rights which the stockholder may have against Louisiana Purchase Corporation, Overland-Louisiana, L. S. Hiern and Housemaster Corporation. Louisiana Purchase Corporation further *351 agrees and authorizes the value of each lot shall be $2,500.00.
4. Each stockholder hereinbelow signed agrees to the above terms and conditions and further agrees that all his rights, claims, causes of action, and interest arising from loans to, employment with, stock ownership in, and any other dealings with Louisiana Purchase Corporation, Overland-Louisiana, L. S. Hiera, and Housemaster Corporation, shall be settled and fully discharged at the time he receives his agreed to number of unencumbered lots from Housemaster Corporation. He further agrees that the stated value of each lot shall be $2,500.00.”
This agreement was signed by Schaefer as follows: “/s/ E. E. Schaefer, Jr. Number of Shares Voting: 300,000. I hereby agree to accept the amount of -7- lots, /s/ E. E. Schaefer, Jr. Feb. 1, 1973”
Schaefer’s explanation for signing this instrument was as follows:
“Mr. Schaefer:
Yes, I do recognize this instrument, and it ties in directly with the instrument that you showed me before with the three hundred thousand shares, et cetera, and again I’ll go back and tell the Court, under oath, that this was not a voting procedure in Louisiana Purchase, but a consent, because at the time the Louisiana Purchase people were questioning the contract validity of the Overland Investment contract and Mr. Hiera and Mr. Roy both had conversations with me asking me in the event that the stock was not in his name, would they be able to use it to, in effect, clear the air with the Overland Investment contract. So, I was not voting as Eugene E. Schaefer, as I said in the very beginning of my testimony, and I will stand on that. But consenting to the possibility that I would be needed if we’d get the stock back from Mr. Roy, and that’s what these two papers were all about.
Q. And you signed that paper.
A. And I signed them, right, to help give them that privilege.
Q. And it says “number of shares voting” and you filled that out did you not?
A. Three hundred thousand.
Q. And in return for which, had this gone through, you would have gotten seven lots, is that correct?
A. Correct. And that’s—
Q. You dated it February 1, 1973?
A. Right. Because that’s when the questions came up from them after once they were in with the Overland Investment people, and I agreed to help them in that position.
Q. And, I’ll ask you, the three hundred thousand shares that are listed there, are those the shares in the proxy, or are those the shares that were originally issued to you in September of ’71?
A. I would have to say that those were the amount of shares they felt that they needed to accomplish the Overland Investment valid contract purchase from Louisiana Purchase and represented the proxies.
Q. Oh, these represented the proxies? A. Yes, sir.”
Schaefer was also confronted with another document entitled Majority Consent of Shareholders to Corporate Action, which began with the preamble:
“We the undersigned shareholders of Louisiana Purchase Corporation and of Leslie Homes, Inc., a wholly owned subsidiary of Louisiana Purchase Corporation, pursuant to LSA-R.S. 12:75, hereby vote our respective shares for the following corporate action, to wit:
The agreement then went on to appoint Hiera, the representative of the two corporations to convey twenty lots to an attorney in consideration for his representation in a suit filed against Louisiana Purchase by Fidelity Mortgage Investors. The agreement was signed on May 31,1973, by Schae-fer as the owner of 300,000 shares of stock *352 and by Schaefer as the voting proxy of W. T. Campbell for 418,599 shares.
Schaefer acknowledged that this was his signature on the document in both capacities, but he testified as follows:
“Q. But you voted shares on May 31, 1973, did you not?
A. I did not vote shares.
Q. That’s not your signature?
A. That’s my signature, but this—
Q. Majority consent agreement?
“MR. SCHAEFER:
This was an instrument that came up after the fact when Mr. Hiern and Overland Investment people were beginning to get the corporation acquired, that we were to have shares of stock to vote at that point to, in effect, go back to the meeting that I had talked about earlier with Louisiana Purchase when they were contesting the contractual righteousness of the Overland agreement to acquire Louisiana Purchase stock, and that’s why this was executed. Because Mr. Hiern, in conjunction with Mr. Roy, asked that I give them this advantage going into that meeting, which I think is reflected in the minutes of that meeting at the country club with Mr. Hiern. At his country club.
Q. So then, you did vote those shares at that time on—
A. No, sir, I did not vote these shares. I did not.
Q. What were you voting at that time? A. I was not voting anything at that time. This was not a vote, but if you will read here ‘a wholly owned subsidiary of Louisiana Purchase Corporation hereby vote for respective shares for the following corporate action.’
Q. Why did you sign that?
A. Because at the time Mr. Roy and Mr. Hiern, along with the Overland Investment people, were having a problem with Louisiana Purchase as to the contractual righteousness of the Overland agreement.”
These instruments constituted admissions against Schaefer’s own interest in this lawsuit since he consistently maintained that he delivered all of his stock to Roy in October, 1971, and was never associated with the corporation thereafter. The burden, therefore, was again on him to explain the documents, and the question is whether he met that burden.
The documents and his explanation should be considered in the light of other pertinent dates and events. On June 30, 1972, a letter was written to Roy by Schae-fer’s attorney in which reference was made to the October, 1971, agreement and Roy was called upon to comply with the obligations he had undertaken in numbered paragraph 2 with respect to the indebtedness to United Ventures Corporation. The letter concludes with the following:
“Mr. Schaefer’s transfer of his stock in the Louisiana Purchase Corporation and his cancellation of his proxy on the shares of W. T. Campbell were conditioned upon compliance with the other provisions of the contract.
“Unless Mr. Schaefer’s personal endorsement on the indebtedness to United Ventures Corporation is released, within ten days of date of this letter, we will be forced to consider the contract to be voidable and the shares of stock returnable to Mr. Schaefer at his election.”
On August 15, 1972, an agreement was entered into between William T. Campbell and Roy in which they cancelled an agreement made between them on October 12, 1971, to exercise Campbell’s proxy.
The answer and third-party demand was filed by Schaefer against Roy in these proceedings on May 15,1973, and Roy’s answer to the third-party demand was filed on June 5, 1973.
Thus, the exercise of voting rights as a stockholder by Schaefer in February, 1973, occurred six months after he had threatened Roy with cancellation of the agreement of October 1, 1971. Roy testified that he contacted Schaefer after getting the June, 1972, letter from Schaefer’s attorney *353 and agreed with Schaefer to cancel the agreement of October, 1971, by mutual consent. Although Roy’s testimony became suspect on cross examination and was evidently rejected by the trial court it was consistent with Schaefer’s action in signing the February, 1973, agreement. In any event, Schaefer signed the instrument voting his stock after consulting an attorney with respect to his legal rights under the October, 1971, agreement and made no expressed reservation of his rights against Roy. This creates an inference that he considered the agreement cancelled. It is likewise implausible that he would exercise his rights as a stockholder again on May 31, 1973, after these proceedings had already been commenced and after he filed his third-party demand against Roy without any expressed reservation of his rights unless he considered the agreement cancelled. Furthermore, on both of these occasions in 1973 he voted as the proxy for Campbell, indicating that he had retrieved the proxy rights he gave up in the October, 1971, agreement.
We also note that his explanation for the May, 1973, agreement that it was merely an attempt to ratify the “contractual righteousness of the Overland agreement” with Louisiana Purchase Corporation has some ostensible application to the agreement of February 2,1973, since that agreement specifically involved Overland. But Overland was not mentioned in the May, 1973, agreement which was simply to convey some lots from Louisiana Purchase to an attorney as his fee for representing Louisiana Purchase in a lawsuit.
In reviewing this case, we follow the guidelines set forth by the Supreme Court in Canter v. Koehring, 283 So.2d 716 (La.1973). That case says the following:
“When there is evidence before the trier of fact which upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error.” (Emphasis supplied)
The case further states “. . . where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review . . .” (Emphasis supplied)
For this reason we have avoided, as we think the trial court did, attaching any credibility to the testimony of Hiern and Roy, for if their testimony had been believed Roy would have prevailed .n the trial court. We have found that as to the obvious conflict between Schaefer’s testimony that delivery of the stock took place and the plain wording of the October, 1971, instrument itself which questions the stock’s delivery and, indeed, its very existence; as to the documents which show that Schaefer exercised his rights as a stockholder six months after demanding that the agreement of October, 1971, be cancelled; and as to his statement in the first of these two documents that he would accept seven lots in his capacity as a stockholder as opposed to some other capacity, his explanations for these acts do not measure up to the test of reasonableness, and the basic standard under the Canter case to bind us to the trial judge’s evaluation of his credibility does not apply.
Thus, we have concluded that Schae-fer failed to prove, 1) what the agreement sued on meant in the first instance and, 2) if the delivery of the stock was required by the agreement and carried out at the time, that the agreement was not subsequently and mutually cancelled.
As to Roy’s reconventional demand, its proof depended upon his own testimony. Since the trial judge disbelieved him, we will affirm that portion of the judgment.
Accordingly, the judgment on the third-party demand in favor of Eugene E. Schae-fer, Jr. and against U. L. Roy is reversed and set aside, and the third-party demand of Eugene E. Schaefer is dismissed. The judgment on the reconventional demand is affirmed. Each party is to bear his own costs.
*354 AFFIRMED IN PART, REVERSED IN PART.

. The terms of this document are almost precisely the terms of the document set out in the case of Louisiana Bank & Trust Company, Crowley v. Bouttee, 309 So.2d 274 (La.1975).

. Louisiana Civil Code, Articles 11 and 12.
“Art. 11. Conventions contrary to law or public policy; waiver of benefits
“Art. 11. Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals.
“But in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to the public good.”
“Art. 12. Contravention of prohibitory law.
“Art. 12. Whatever is done in contravention of a prohibitory law, is void, although the nullity be not formally directed.”
Louisiana Civil Code, Articles 3060, 3061, and 3063.
“Art. 3060. Defenses available to surety
“Art. 3060. The surety may oppose to the creditor all the exceptions belonging to the *348 principal debtor, and which are inherent to the debt; but he can not oppose exceptions which are personal to the debtor.”
“Art. 3061. Loss of subrogation by acts of creditor
“Art. 3061. The surety is discharged when by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety.”
“Art. 3063. Extension of time without consent of surety
“Art. 3063. The prolongation of the terms granted to the principal debtor without the consent of the surety, operates a discharge of the latter.”